# United States Court of Appeals
## For the First Circuit

Nos. 06-1283
     07-1001

UNITED STATES OF AMERICA,

Appellee,

v.

DAVID MORALES-MACHUCA,
QUESTER STERLING-SUÁREZ,

Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Torruella, Selya, and Howard,
Circuit Judges.

Lydia Lizarribar-Masini, on brief for appellant Morales.
Raymond L. Sánchez-Maceira, on brief for appellant Sterling.
Thomas F. Klumper, Assistant United States Attorney, Nelson
Pérez-Sosa, Assistant United States Attorney, Chief, Appellate
Division, and Rosa Emilia Rodríguez-Vélez, United States Attorney,
on brief for appellee.

October 17, 2008

**TORRUELLA**, **Circuit Judge**.    David Morales-Machuca ("Morales") and Quester Sterling-Suárez ("Sterling") were indicted by a federal grand jury on multiple counts relating to an armored car robbery in which a security guard was killed.  After an eight-day jury trial, both Morales and Sterling were found guilty as to all charged counts.  They were each sentenced to life terms of imprisonment.  Morales now appeals his conviction and sentence on various grounds.  Sterling appeals only his sentence.  After careful consideration of the defendants' various arguments, we affirm.

## I.  Background

Morales challenges the sufficiency of the evidence supporting his conviction.  We therefore rehearse the facts in the light most favorable to the jury's guilty verdict, consistent with record support.  See United States v. Mousli, 511 F.3d 7, 14 (1st Cir. 2007).

### A.  The Robberies

On the morning of November 30, 2001, a Ranger American Armored Securities Services truck containing $180,000 arrived at the Saulo de Rodríguez Credit Union in Gurabo, Puerto Rico.  As James Cruz-Matías ("Cruz"), one of the two security officers delivering the money, exited the truck and walked towards the credit union, Hernando Medina-Villegas ("Medina") approached him with a pistol in his hand.  Sterling and another assailant, both

armed with pistols, appeared on either side of Cruz and threatened to shoot him. The three assailants seized the bag with the money and fled in a dark-colored Jeep Grand Cherokee. A short time later, the police discovered a burned-out Grand Cherokee in the area.

Around noon on March 6, 2002, another armored truck attempted to deliver $300,000 to the Valenciano Cooperative in Juncos, Puerto Rico. The truck was driven by security officer Eluber Torres-Alejandro ("Torres"), who was accompanied by his partner, Gilberto Rodríguez-Cabrera ("Rodríguez"). As Torres walked toward the credit union, Lorenzo Catalán-Román ("Catalán") approached with a firearm to demand the money. The robbery, however, failed. Torres pulled out a firearm and Rodríguez opened the truck door and aimed another gun at Catalán. Catalán turned and fled. Torres observed that as Catalán ran away, a motorcyclist who had lingered behind the truck and a blue Chevy Lumina with tinted windows both sped away.

On the morning of March 27, 2002, Torres and Rodríguez attempted to make another delivery, this time $100,000 to the Saulo de Rodríguez Credit Union in Gurabo, Puerto Rico. However, before Rodríguez reached the front door of the credit union, Medina and Catalán approached with pistols in their hands. Rodríguez made no resistance and raised his hands, but Medina fired a shot from a

Glock 9mm pistol and Rodríguez fell back against the building window.

Hearing the gunfire, Torres opened the truck door and shot Catalán in the leg.  Torres's hand was then hit by a bullet from an unseen shooter.  Injured, he climbed back into the truck.  As Rodríguez begged for his life, Medina took the bag of money and fired another shot at him.  Medina fled, leaving an injured Catalán behind.  Catalán then picked up his pistol and fired six shots at Rodríguez, who was lying prone on the ground and begging for mercy.  Rodríguez died as a result of gun shot wounds.

Soon thereafter, Sterling appeared from the drive-through area with a gun in his hand.  Sterling attempted to help the injured Catalán, but fled when the police arrived.  One officer arrested Catalán and another chased, but then lost, Sterling in the nearby wooded area.  A few hours later, a wet and dirty Sterling, who was sitting on the side of the road near the credit union, was arrested by the police.  After being advised of his rights, Sterling confessed to participating in the robbery and throwing aside his gun as he fled from the police.  He described how he had been picked up early that morning and had waited in the parking lot for the armored truck to arrive.  He also confessed that he had participated in other robberies with the same group of people.

Nearby, the police recovered a stolen green Ford Explorer that contained the Glock 9mm pistol used by Medina to shoot

-4-

Rodríguez, as well as eleven shell casings and a bullet fragment. At trial, the government's ballistics expert testified that the casings, fragment, and the bullet from Torres's injured hand were all traced to a Taurus 9mm pistol that belonged to Morales.

## B. Morales

Between June 2000 and March 2002, Morales worked as a truck driver and received minimum wage. His gross weekly pay was approximately $200. In 2001, he and his wife, Minerva Núñez-Morales, reported a total gross annual income of $11,342 on their tax forms. In 2001, Morales became romantically involved with Jocelyn Serrano-Castro ("Serrano"). According to Serrano, Morales was close friends with Medina, Catalán, Sterling, and Pablo Sánchez-Rodríguez ("Sánchez").

Despite his relatively modest income, Morales was able to buy cars for both his wife and Serrano. On or about December 10, 2001, Morales purchased a 1993 blue Chevy Lumina for Serrano after telling her that he had "scored a big hit." On December 18, 2001, Morales's wife inspected a 1996 green Chevy Lumina, called Morales to report that the car was in good condition, and then paid the seller $5,000 in cash. And then in April 2002, he paid for more than half the $7,200 price of a 1994 blue Grand Marquis.

The blue Chevy Lumina, however, was taken away from Serrano some time in February 2002, one month before the second robbery. The pair had a fight and Morales allegedly struck Serrano

in the head with a Taurus 9mm pistol that he always carried with him. Morales later forced Serrano to transfer the car to Medina. At trial, Serrano testified that although the car belonged to Medina, she had never seen him drive it. Morales almost always drove the car. Medina owned other means of transportation, including a motorcycle.

Serrano testified in great detail regarding the events of March 27, 2002, the day of the fatal armed robbery. She related how Morales came to pick her up around 9:00 a.m. in a blue Chevy Lumina. When she expressed some surprise at the early hour, Morales told her that the "guys had scored a hit and he did not trust the person that was going to pick them up." He told her that "the guys had called him so he would go pick them up." They drove to Gurabo where Sánchez was waiting. The two men parked their cars and talked for about 15-20 minutes in Sánchez's vehicle. As Serrano and Morales were driving back to Bayamón, he received a call from Sánchez. Morales then called his wife and switched cars -- the green Chevy Lumina for the blue Chevy Lumina.

A few hours later, Morales picked up Serrano and drove to a Wendy's parking lot in Caguas. Serrano testified that Morales met with Sánchez and another individual, who gave Morales a duffel bag containing cash. Later that evening, Morales and Serrano drove back to the Gurabo area and stopped at a mile-marker on the edge of the highway. Morales stepped out of the car, reached behind the

-6-

mile-marker, and retrieved his Taurus 9mm pistol. They then drove to a shopping mall and purchased two new cell phones.

The following day, March 28th, Morales and Serrano went to visit Medina. Serrano observed that the apartment was full of new furniture and Medina responded that "they had scored a big hit and that they were buying everything new." A couple of weeks later, Morales paid for half the cost of a 1994 blue Grand Marquis.

On April 17, 2002, Morales and Serrano were driving in the Grand Marquis when they were stopped by the police for driving with tinted windows. Morales hid the Taurus 9mm pistol in Serrano's purse, but the police discovered the loaded gun and arrested both Morales and Serrano. Morales told the arresting officer that the gun belonged to him.

### C. Jury Trial and Sentencing

Morales, Sterling, and three co-defendants were charged in a ten-count indictment. Morales and Sterling were both charged with: Count One, conspiring to obstruct commerce by robbery, in violation of 18 U.S.C. § 1951(a);[1] Count Two, aiding and abetting

---

[1] 18 U.S.C. § 1951(a) reads:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

in the knowing possession, use, or carrying of firearms in furtherance or during and in relation to the conspiracy alleged in Count One, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii)[2] and 2;[3] Count Seven, aiding and abetting in the March 27, 2002 robbery of approximately $100,000, in violation of 18 U.S.C. §§ 1951(a) and 2; Count Eight, aiding and abetting in the knowing possession, brandishing, use, or carrying of firearms during and in relation to the robbery, which unlawfully killed Rodríguez with malice aforethought, in violation of 18 U.S.C. §§ 924(j)[4] and 2; Count

---

[2]  18 U.S.C. § 924(c)(1)(A)(iii) reads:

> [A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . , uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

[3]  18 U.S.C. § 2 reads:

> (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal. (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

[4]  18 U.S.C. § 924(j) reads:

> A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall: (1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life; and (2) if the killing is manslaughter (as defined in section 1112), be punished as provided in that section.

-8-

Nine, aiding and abetting in the knowing possession, brandishing, use, or carrying of firearms during and in relation to the March 27, 2002 robbery alleged in Count Seven, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2. Additionally, Sterling was charged with: Count Three, aiding and abetting in the November 30, 2001 robbery of more than $100,000, in violation of 18 U.S.C. §§ 1951(a) and 2, and Count Four, aiding and abetting in knowing possession, use or carrying of firearms in furtherance or during and in relation to the November 30, 2001 robbery, in violation of 18 U.S.C. §§ 924(c)(1)(A)(iii) and 2. Morales additionally was charged in Count Ten with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).[5]

Morales and Sterling pleaded not guilty and the two went to trial on August 29, 2005. The government's first witness, Torres, testified about both the March 27, 2002 robbery and the March 6, 2002 attempted robbery. Counsel objected to the testimony regarding the attempted robbery. The district court overruled the objection and allowed the testimony.

After the presentation of the government's case-in-chief, defense counsel filed for judgments of acquittal on nearly all counts.[6] After limited oral argument, the court denied the Rule 29

---

[5] Morales had a prior 1996 attempted murder felony conviction from Puerto Rico that had resulted in a two-year term of incarceration.

[6] Morales's counsel stated that he would not contest Count Ten.

motions.  Morales presented an expert witness, a firearms and ballistics consultant, who testified that in his opinion, the various rounds and casings submitted into evidence by the government were not fired by the Taurus pistol.  The defendants rested and failed to renew their Rule 29 motions.  On September 9, 2005, the jury returned a verdict, finding both Morales and Sterling guilty on all counts.  There was no renewal of the Rule 29 motions following the verdict.

On December 12, 2005, Sterling was sentenced to:  twenty-year terms as to each of Counts One, Three, and Seven, to be served concurrently; thirty-year terms as to each of Counts Two and Nine, to be served concurrently to each other and to the sentence in Count Four, but consecutively to the other counts; a twenty-one year term as to Count Four; and a life term of imprisonment as to Count Eight.  On January 11, 2006, Morales was sentenced to: twenty-year terms each as to Counts One and Seven and a ten-year minimum as to Count Ten, to be served concurrently with one another; thirty-year terms each as to Counts Two and Nine, to be served concurrently with each other, but consecutively to the other counts; and a life term of imprisonment as to Count Eight.

## II. **Discussion**

### A. **Morales's Rule 29 Challenge**

On appeal, Morales challenges the sufficiency of the evidence underlying the jury's guilty verdict on Counts One, Two, Seven, Eight, and Nine. He argues that the government failed to demonstrate his involvement in the conspiracy to commit robbery or in the carrying and use of a firearm in furtherance of that conspiracy. With respect to Count Eight, he further argues that the government failed to prove that he had the requisite malice aforethought in the commission of the murder. He does not challenge his conviction for possessing a firearm as a felon (Count Ten).

At the close of the government's case-in-chief, Morales moved for a judgment of acquittal. The district court denied the motion. After the presentation of the defendants' case, Morales failed to renew his motion. The jury returned a guilty verdict. In the seven days following the verdict, Morales did not renew his motion. See Fed. R. Crim. P. 29(c)(1). As we have cautioned defendants in the past, "[t]hese omissions combine to constitute a waiver of [Morales's] earlier Rule 29 motion." United States v. Maldonado-García, 446 F.3d 227, 230 (1st Cir. 2006) (citing United States v. Hadfield, 918 F.2d 987, 996 (1st Cir. 1990)). Accordingly, we review only for "clear and gross injustice." Id.

-11-

In evaluating Morales's challenge to evidentiary sufficiency, we consider whether a rational jury could have concluded that the government proved each element of the charged offenses beyond a reasonable doubt. In so doing, we view the evidence in the light most favorable to the jury's guilty verdict and "resolve all questions of credibility and reasonable inferences in favor of the verdict." United States v. Lizardo, 445 F.3d 73, 81 (1st Cir. 2006) (citing United States v. Ruiz, 105 F.3d 1492, 1495 (1st Cir. 1997)). "[D]efendants challenging convictions for insufficiency of evidence face an uphill battle on appeal." United States v. O'Shea, 426 F.3d 475, 479 (1st Cir. 2005) (quoting United States v. Hernández, 218 F.3d 58, 64 (1st Cir. 2000)). Applying that standard with a focus on whether there was error engendering clear and gross injustice in this case, we conclude that there was no such injustice here.

### 1. Obstructing Interstate Commerce through Robbery

Looking first to the two Hobbs Act violations, 18 U.S.C. § 1951(a), the government had to prove that Morales conspired (Count One) and aided and abetted (Count Seven) to obstruct, delay, or affect commerce by robbery. The Act defines robbery as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force." Id. § 1951(b)(1). A Hobbs Act conspiracy requires the government to prove "an intent to agree and an intent

-12-

to commit the substantive offense."  United States v. Palmer, 203 F.3d 55, 63 (1st Cir. 2000).[7]  In carrying its burden, the government can use "circumstantial evidence, and the government need only demonstrate a tacit understanding between the conspirators to prove its case."  Id. at 64.

On appeal, Morales contends that the government failed to demonstrate that he participated in the alleged robberies and conspiracy.  The government concedes that it presented no direct evidence of Morales's participation in the robberies, as no witnesses identified Morales at the scene of either robbery.  The government counters, however, that it presented sufficient circumstantial evidence to support a finding of guilt beyond a reasonable doubt.  See United States v. Llinas, 373 F.3d 26, 31 (1st Cir. 2004) (citing United States v. Gómez-Pabón, 911 F.2d 847, 853 (1st Cir. 1990)); see also United States v. Valerio, 48 F.3d 58, 63 (1st Cir. 1995) ("[T]he government's proof may lay entirely in circumstantial evidence.") (citation omitted).  We agree.

---

[7]  Morales does not contest the interstate commerce element in his appeal.  In any event, the record clearly establishes that the government made the requisite showing.  Under the Hobbs Act, the "government need only show that the robbery created 'a realistic probability of a de minimis effect on interstate commerce.'" United States v. DeCologero, 530 F.3d 36, 68 (1st Cir. 2008) (quoting United States v. Capozzi, 347 F.3d 327, 335 (1st Cir. 2003)).  In this case, the President of Ranger American Armored Securities Services testified that the losses resulting from the robberies affected his ability to make purchases in the United States to operate his business.  Accordingly, the robberies resulted in a sufficient impact on commerce.

First, the jury heard testimony that Morales earned a minimum wage salary, yet was able to purchase several thousand dollars worth of cars for his wife and girlfriend. In December 2001, he purchased a green 1996 Chevy Lumina for his wife. In December 2001, he also purchased a blue 1993 Chevy Lumina for Serrano. And then in April 2002, he was involved in the purchase of a blue 1994 Grand Marquis.[8] Morales paid for these purchases in cash. With respect to the March 27, 2002 robbery, Serrano testified that Morales picked up a duffel bag containing a sum of cash after a meeting in a Wendy's parking lot. The government argues that, in addition to this suspicious influx of cash, the timing of these car purchases coincided with the commission of the two robberies: November 2001 and March 2002.

Second, Serrano testified that on March 27, 2002, Morales told her that "the guys had scored a hit and . . . the guys had called him so that he would go pick them up." That day, they drove along the road to Gurabo and Morales retrieved his Taurus 9mm pistol from behind a specific highway mile-marker. With respect to the pistol, the jury heard from the government's firearm expert who testified that the gun was used to fire the eleven casings found on the floor of the Ford Explorer found abandoned near the scene of

---

[8] The government's witness, an automobile dealer at Yamilisy Auto Sales, testified that a woman, Marisol Ríos Matías, and a man purchased the blue 1994 Grand Marquis for $7,200. The purchase was entirely in cash, with more than half provided by Morales.

the March 27 robbery.  Ballistics reports also linked the gun to the bullet that had struck Torres's hand during the robbery shoot-out.

Based on this evidence, a reasonable jury could have concluded that Morales participated in the conspiracy to obstruct interstate commerce through robbery (Count One), and aided and abetted the commission of the March 27, 2002 robbery (Count Seven).  While a large portion of the evidence submitted to the jury regarding Morales's role in the offense is based primarily on Serrano's testimony, the jury reasonably credited her account of the events.  It is not for us to make credibility determinations in the course of a review of the sufficiency of the evidence.  Our task is only to determine whether a rational jury could have believed the testimony.  See United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992).  Here, a rational jury could have and did so.

### 2.  Carrying or Use of Firearm During Crime of Violence

Under the firearms statute relating to Counts Two and Nine, the government had to shoulder the burden of proving that Morales aided and abetted in the use or carrying of a firearm "during and in relation to any crime of violence."  18 U.S.C. § 924 (c)(1)(A).  A violation of the Hobbs Act is a crime of violence for purposes of this statutory provision.  See, e.g., United States v. Rodríguez-Casiano, 425 F.3d 12, 13 (1st Cir. 2005).

-15-

On April 17, 2002, Morales and Serrano were pulled over for a traffic violation and then arrested when the police discovered a gun in Serrano's purse. After being duly informed of his rights, Morales told the police that the gun belonged to him. At trial, Serrano testified that Morales almost always carried the Taurus 9mm gun with him. She also testified that on March 27, Morales retrieved the gun from behind a mile-marker on the highway to Gurabo. Additionally, the government presented ballistics evidence linking the Taurus 9mm gun to both the casings and the bullet fired into Torres's hand during the March 27, 2002 robbery. While the government proffered no direct evidence that Morales had knowingly supplied or given the gun to those physically involved in the robbery that morning, a jury could make such an inference on the basis of the testimony regarding the post-robbery events. In any event, we review this sufficiency claim only for clear and gross injustice as a result of Morales's failure to renew his Rule 29 motion. Morales's scarcely developed argument falls short of that required showing.

### 3. Aiding and Abetting in the Use of a Firearm During a Violent Crime, Which Unlawfully Killed Rodríguez

In order to sustain a violation of 18 U.S.C. § 924(j)(1), the government had to demonstrate that Morales aided and abetted the use of a firearm in committing a crime of violence, and in the course of that violation caused the murder of Rodríguez through the

use of the firearm. A violation of 18 U.S.C. § 1951(a) is a crime of violence. See, e.g., United States v. Jiménez-Torres, 435 F.3d 3, 10 (1st Cir. 2006). For the purposes of this violation, murder is defined as the "unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111. That provision goes on to enumerate a list of murders categorized as murder in the first degree, including "murder . . . committed in the perpetration of . . . robbery." Id.

In his appeal, Morales contends that the government failed to establish the malice element of the offense. He argues that the evidence in the record establishes only that there was a "robbery, that things got out of hand, a shooting ensued and a death resulted." Morales's argument is unavailing under our case law. In United States v. Shea, 211 F.3d 658 (1st Cir. 2000), we concluded that 18 U.S.C. § 1111 "was intended to adopt the felony murder rule, and for a stated felony the 'malice' element is satisfied by the intent to commit the unlawful felony." Id. at 674 (citing cases).

The government presented evidence at trial that Morales aided and abetted in a conspiracy to commit and the commission of the March 27, 2002 armed robbery. That morning, Medina, Catalán, and Sterling waited for the armored truck with the intent to commit a robbery. The group was armed with pistols and, in the course of the robbery, Medina and Catalán shot and killed Rodríguez. Under

-17-

18 U.S.C. § 1111, the killing of Rodríguez was "first-degree murder by those who perpetrated the robbery, regardless of who pulled the trigger or any individual intent." Id. Having concluded that a reasonably jury could find that Morales aided and abetted in the commission of the robbery and in the use of the firearm, it follows that his conviction for murder is reasonable as well.

Based on the record evidence, we conclude that a reasonable jury could have found Morales guilty beyond a reasonable doubt of all of the charged offenses. He therefore fails to make the more difficult showing of clear and gross injustice. Accordingly, we affirm the district court's denial of his Rule 29 motion.

### B.  Morales's Evidentiary Challenge

Morales also argues that the district court erred in admitting Torres's testimony regarding the March 6, 2002 attempted robbery. He contends that the testimony was unfairly prejudicial and outweighed its probative value. In general, we review evidentiary rulings by the district court regarding the admissibility of evidence for an abuse of discretion. See United States v. Barrow, 448 F.3d 37, 42 (1st Cir. 2006) (citing United States v. Cruz, 352 F.3d 499, 504 (1st Cir. 2003)). Even if the district court erred in admitting the evidence, we review only for prejudicial error. See United States v. Shea, 159 F.3d 37, 40 (1st Cir. 1998) ("[A] non-constitutional evidentiary issue will be

-18-

treated as harmless if it is highly probable that the error did not contribute to the verdict." (quoting United States v. Rose, 104 F.3d 1408, 1414 (1st Cir. 1997))).

The district court denied Morales's objection and agreed with the government's argument that the evidence was sufficiently connected to the conspiracy: "[I]t is not only the similarity of the modus operandi and the participants, but it's also the fact that they are targeting . . . the same armored car company . . . the same route . . . and it is about three weeks prior to the March 27th robbery." According to the testimony of Torres, on March 6, 2002, he and his partner were delivering $300,000 to the Valenciano Credit Union, and narrowly avoided being robbed. Torres testified that his would-be assailant -- later identified as Lorenzo Catalán, who was involved in the March 27, 2002 robbery -- approached him as he was making his way to the front door of the credit union. He and his partner Rodríguez drew their weapons and Catalán fled. Torres testified that immediately thereafter, a suspicious man on a motorcycle who had been lingering behind the truck sped away and a blue Chevy Lumina with tinted windows also sped out of the parking lot.

At trial, the government asserted that the two charged robberies -- on November 30 and March 27 -- were part of a conspiracy to obstruct commerce through robbery. The government presented evidence that the robberies evinced the following

similarities: early morning deliveries to Gurabo-area credit unions by Ranger American Armored Securities Services trucks; one or two armed assailants, with unseen others providing cover; and the participation of the same individuals. See United States v. Morrow, 39 F.3d 1228, 1233-34 (1st Cir. 1994) (resolving a sufficiency challenge by looking to the nature of the scheme, identity of participants and victims, and commonality in timing and goals in a series of transactions in an alleged conspiracy). In further support of its case, the government offered the testimony of Torres who testified to the events of March 6, 2002, that exhibited the same modus operandi. Moreover, the jury had also heard Serrano's testimony that Morales had taken the blue Lumina from her about a month before the robbery, and that his confederate Medina drove a motorcycle.

We conclude that the district court did not abuse its discretion in concluding that the probative value of the testimony outweighed the risk of unfair prejudice. To prove that Morales and Sterling were guilty of violating 18 U.S.C. § 1951(a), the government was required to prove that the defendants had conspired to obstruct commerce by robbery. This evidentiary burden made evidence of other actions taken in furtherance of that conspiracy probative. See United States v. Medina, 761 F.2d 12, 15 (1st Cir. 1985). Although the testimony linking Morales to the March 6th attempted robbery was by no means overwhelming, the court was

within its discretion in deeming it admissible as a means of proving the charged conspiracy. Indeed, given that we will only reverse a district court's "on-the-spot judgment" regarding the balance of probative value and unfair effect in "extraordinarily compelling circumstances," we are unconvinced that this case gives us reason to do so. United States v. Lewis, 40 F.3d 1325, 1339 (1st Cir. 1994) (quoting United States v. Rodríguez-Estrada, 877 F.2d 153, 155-56 (1st Cir. 1989)).[9]

## C. Morales's Sentencing Challenge

Morales appeals the district court's denial of his request for a downward adjustment for a minor role. Prior to his sentencing hearing, he objected to the Pre-Sentence Report ("PSR"), arguing that he was entitled to a minor role adjustment under U.S.S.G. § 3B1.2(b). The government disagreed and argued that Morales could not be characterized as the least culpable in view of his role supplying the gun and sharing in the proceeds. The district court denied the request for minor-role adjustment.

Unless there is a mistake of law, we review a district court's denial of downward adjustment for clear error. See United States v. Bravo, 489 F.3d 1, 11 (1st Cir. 2007). Given the fact-

[9] Moreover, even if the district court had erred in admitting the testimony, we would conclude that such error was harmless. The testimony about the March 6th attempted robbery was brief and cumulative. Morales's guilt in this case turned, in significant part, on the credibility of Serrano's testimony and the testimony linking Morales's Taurus 9mm gun to the March 27, 2002 shooting.

specific nature of a defendant's status determination, great deference is given to the district court: "[B]attles over a defendant's status . . . will almost always be won or lost in the district court." United States v. Teeter, 257 F.3d 14, 31 (1st Cir. 2001) (quoting United States v. Conley, 156 F.3d 78, 85 (1st Cir. 1998)); see also United States v. Graciani, 61 F.3d 70, 75 (1st Cir. 1995) (same).

Under U.S.S.G. § 3B1.2, a defendant can qualify as a minor participant and receive a two-level reduction in his base offense level if he proves by a preponderance of the evidence that he was "less culpable than most other participants." Id. cmt. 5; see also United States v. García, 954 F.2d 12, 18 (1st Cir. 1992) (defendant seeking downward adjustment carries the burden of proof). Less culpable, however, does not simply mean that the defendant was not the leader. The defendant must be "not only less culpable than h[is] cohorts in the particular criminal endeavor, but also less culpable than the majority of those within the universe of persons participating in similar crimes." Teeter, 257 F.3d at 30-31 (citing United States v. Murphy, 193 F.3d 1, 9 (1st Cir. 1999)).

Here, Morales contends that he was a minor participant when contrasted with the other participants who were "organizers, supervisors, [and] physically participated in the robbery and the shootout which resulted in a death." At the sentencing hearing, he

conceded that he was not the least culpable -- Sánchez was admittedly at the bottom of the hierarchy -- but, he also argued that he should be considered a minor participant because he was not the most culpable. The district court denied the request. The court determined that Morales's role in the offense was more significant than that of a mere minor participant, indeed the court found him to be "intimately involved." Morales was in telephonic contact with the other defendants who were physically participating in the robbery; was supposed to pick-up the defendants after the March 27, 2002 robbery; supplied the Taurus 9mm pistol that shot Torres in the hand during the shoot-out; and enjoyed a share of the stolen money. Based on the record, the district court reasonably concluded that Morales's role "outstripped the . . . 'minor' rungs on the hierarchical ladder of blameworthiness." García, 954 F.2d at 18. We thus find no error in the district court's denial of the downward role-in-the-offense adjustment.

### D. Sterling's Sentencing Challenge

On September 9, 2005, the jury found Sterling guilty on all charged counts. At his sentencing hearing on November 17, 2006, he was sentenced to: twenty-year terms as to Counts One, Three, and Seven, to be served concurrently; thirty-year terms as to Counts Two and Nine, to be served concurrently to each other and the sentence in Count Four, but consecutively to the others counts;

a twenty-one year term as to Count Four; and a life term imprisonment as to Count Eight.[10]

Our review of a district court's sentence is a two-step process, with both a substantive and procedural component. See United States v. Politano, 522 F.3d 69, 72 (1st Cir. 2008) (citing Gall v. United States, 128 S. Ct. 586, 597 (2007); United States v. Martin, 520 F.3d 87, 91-93 (1st Cir. 2008)). With respect to our procedural inquiry, we look to whether the district court properly calculated the Guidelines range, treated the Guidelines as advisory, considered the various 18 U.S.C. § 3553(a) factors, and adequately explained the chosen sentence. See id. (citing Gall, 128 S. Ct. at 597). In this case, the district court made the appropriate Guidelines calculations for all counts and considered the proper statutory factors.

Having found no procedural error, we next turn to the substantive reasonableness of the defendant's sentence. See Politano, 522 F.3d at 72. We review under a highly deferential abuse of discretion standard. See id. (citations omitted); see also Martin, 520 F.3d at 96 ("[T]he linchpin of a reasonableness

---

[10] Sterling was first sentenced on December 12, 2005. Three months after his sentencing hearing, he filed a motion requesting resentencing because he had not fully understood his right of allocution. The court held a second sentencing hearing on November 17, 2006. After being duly informed of his right of allocution, Sterling declined to exercise it. The court then imposed the same sentence.

-24-

sentence is a plausible sentencing rationale and a defensible overall result.").

Sterling's challenge to the substantive reasonableness of his life sentence faces an uphill battle. A sentence within the applicable Guidelines range is presumptively reasonable. See Rita v. United States, 127 S. Ct. 2456, 2463 (2007) ("[T]he presumption reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, both the sentencing judge and the Sentencing Commission will have reached the same conclusion as to the proper sentence in the particular case.") (emphasis in original). Here, Sterling's sentence of life imprisonment was based on his conviction under 18 U.S.C. § 924(j). Under the Guidelines, a § 924(j) offense (assuming the application, as in this case, of U.S.S.G. § 2A1.1) has a base offense level of forty-three, which corresponds to a recommended sentence of a life term of imprisonment.

Sterling first argues that the sentence was unreasonable because he was not the one to shoot Rodríguez. This argument is meritless. While Sterling was not the actual shooter, the jury found that he had aided and abetted in two separate armed robberies: in the first, Sterling was one of two assailants who threatened to shoot the security officer; and in the second, the evidence (indeed his own confession) linked him to the robbery that resulted in Rodríguez's death. Indeed, with respect to his role in

the robbery, the PSR stated that Sterling was "providing cover for the other assailants while they shot Mr. Rodríguez."

Second, he argues that the district court should have afforded greater weight to his personal background and lack of criminal history. He argues that the court failed to consider whether a life sentence was appropriate for a twenty-seven year old defendant with a tenth grade education and no prior criminal history. Looking to the terms of incarceration imposed for all of the other charges, he posits that the fifty years he received was more than sufficient to administer just punishment, reflect the seriousness of the offense, promote respect for the law, afford adequate deterrence, and protect the public. See 18 U.S.C. § 3553(a). He argues that the imposition of a life sentence for Count Eight was unnecessary.

While we might have imposed a lesser sentence in this case if we were sitting as the sentencing court, that is not a basis for reversal. We afford broad discretion to the district court in affixing the appropriate sentence and we recognize that "there is not a single reasonable sentence but, rather, a range of reasonable sentences." Martin, 520 F.3d at 92. This is a case in which the district judge who had presided over trial was intimately familiar with the facts and the particular acts attributed to the defendant. After hearing argument from counsel on the § 3553(a) factors, the district court stated that it had considered them all

and announced its sentence. While the court's explanation was by no means lengthy, we have held that a sentencing court is "not required to address those factors, one by one, in some sort of rote incantation when explicating its sentencing decision." United States v. Dixon, 449 F.3d 194, 205 (1st Cir. 2006); see also United States v. Brandao, 539 F.3d 44, 65 (1st Cir. 2008). The trial record makes evident that Sterling was involved in a serious armed robbery that resulted in the violent death of an innocent security guard. We are unable to conclude that the Guidelines sentence imposed here "falls outside the expansive boundaries of that universe" of reasonable sentences. Martin, 520 F.3d at 92. Accordingly, we affirm the district court's sentence.

### III.  Conclusion

For the foregoing reasons, we affirm Morales-Machuca's conviction and sentence and affirm Sterling-Suárez's sentence.

**Affirmed**.