# United States Court of Appeals
## For the First Circuit

No. 13-2154

UNITED STATES OF AMERICA,

Appellee,

v.

ALFREDO PACHECO-MARTINEZ,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colón, U.S. District Judge]

---

Before

Howard, Chief Judge,
Selya and Lynch, Circuit Judges.

---

Robert Herrick for appellant.
Susan Z. Jorgensen, Assistant United States Attorney, with whom Rosa Emilia Rodríguez-Vélez, United States Attorney, and Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, were on brief, for appellee.

---

June 15, 2015

---

**Lynch**, **Circuit Judge**.    Defendant Alfredo Pacheco-Martinez was convicted of various offenses arising from his multi-year effort to swindle scores of unsuspecting victims out of over a million dollars and to manipulate the U.S. Bankruptcy Code in order to shield his ill-gotten gains from creditors.    He now appeals from one of the counts of conviction, arguing that there was insufficient evidence to support the jury's guilty verdict. He also attacks his sentence, arguing that the district court improperly calculated the applicable Sentencing Guidelines range and imposed a procedurally and substantively unreasonable sentence.    We find no merit in any of these contentions and affirm Pacheco's conviction and sentence.

I.

Because Pacheco challenges the sufficiency of the evidence supporting his conviction on one count, we recite the facts relevant to that claim in the light most favorable to the jury verdict.    See United States v. Burgos-Montes, ___ F.3d ___, 2015 WL 2223304, at *1 (1st Cir. May 13, 2015).    In discussing facts relevant to Pacheco's claims of sentencing error, we rely in part on unchallenged portions of the Presentence Investigation Report (PSR).    See United States v. Vázquez-Larrauri, 778 F.3d

- 2 -

276, 291 (1st Cir. 2015).  We confine our discussion here to the background necessary to frame the issues raised on appeal.

In 2003,[1] Pacheco formed a limited liability company, International Business Group and Affiliates (IBGANV), in Nevada through a registered agent service, Corporate Services of America (CSA).  CSA offered a "virtual headquarters program" that gave entities which were not physically in Nevada a legal presence in the state.  Pacheco was listed as the sole manager of IBGANV.

Also in 2003, Pacheco formed a corporation in Puerto Rico called International Business Group and Affiliates (which we will call simply IBGA), for which he was the president and registered agent.  Pacheco's daughter Leyda was listed as the vice president of IBGA, and his other daughter Mayra was listed as the treasurer.  IBGA was not registered to make investments in Puerto Rico.

Finally, in July 2005, Pacheco formed a third entity, Liberty Dollars of Puerto Rico, Inc. (LDPR).  Pacheco was listed as LDPR's registered agent and its only director and officer.  The

---

[1]     Pacheco has a history of dubious dealings that began well before the conduct that gave rise to this conviction.  In 2002, the Puerto Rico entity responsible for securities regulation filed a cease and desist order against Pacheco based on his marketing of "rebate coupons" that purported to allow the purchaser to be relieved of his or her mortgage in three to five years. Pacheco was ultimately fined $50,000 for a violation of Puerto Rico's securities laws.

corporation's physical address was a P.O. Box in Yauco, Puerto Rico.

Pacheco used these entities to engage in two fraudulent schemes: the "Liberty Dollar program" and the "Debt Elimination program." Under the first program, Pacheco sold medallions with a small silver content to individuals as a "substitute form of coinage." He obtained the Liberty Dollars from NORFED, a "national organization dedicated to the repeal of the Federal Reserve Act and the Internal Revenue [C]ode." Pacheco marketed the Liberty Dollars as protection against inflation, telling potential buyers that the Liberty Dollars, unlike U.S. currency, could not lose value based on the actions of the Federal Reserve. Pacheco also marketed a variant on the Liberty Dollar called the "Boricua Dollar" that specifically targeted Puerto Rico.

The evidence at trial demonstrated that the Liberty Dollars and Boricua Dollars operated much like a pyramid scheme: IBGA "would sell them through distribution channels, with each subsequent buyer paying a higher amount until the [dollars] reached a final user." Pacheco told prospective buyers that they could either market the Liberty Dollars or use them as currency at certain businesses. The marketing materials Pacheco issued in connection with the Liberty Dollars predicted that the annual returns for buyers would range from 6 percent to over 25 percent.

In 2006, the U.S. Mint notified Pacheco that the introduction of Liberty Dollars into circulation was illegal, but he nevertheless continued to market and sell the coins. Pacheco's companies ultimately received $59,512 from the sale of the Liberty Dollars and Boricua Dollars to the public.

Under the Debt Elimination program, IBGA marketed and sold, for a fee of $3,000-$3,500, a program which purported to allow buyers to pay off their debts in a short amount of time. IBGA obtained the program from a company called Mortgage Alternatives. Between 2004 and 2005, some 225 people bought the debt elimination program, but their debts were not relieved. The program in fact "did not work."

Pacheco also sold "Investment Contracts" pursuant to which an individual would buy "blocks" of investments for $25,000 each. Pacheco represented that the money would be used to promote the marketing and sales of the debt elimination program, and guaranteed investors a minimum return of $500 per month or 24 percent per year for each "block."

Pacheco provided prospective investors with a "Proposal and Business Plan" in Spanish and a copy of the Investment Contract in English. The two documents differed in crucial ways: the contract itself included a section advising that the investment

was "speculative" and involved a "substantial degree of risk of loss," while the Spanish document omitted any mention of risk.

Pacheco told prospective investors "that he was IBGANV's representative in Puerto Rico, working under the local subsidiary IBGA[]." He thus led the investors to believe that he was backed by a large United States corporation, when in fact "no actual business programs or operations took place out of IBGANV." After an individual invested with him, Pacheco would for a short period of time make "lulling" interest payments to the investor in order to give him or her the mistaken impression that the investment was safe and would generate the promised return. But the investments were never fully -- or even mostly -- repaid. Twelve individuals ultimately invested over $1 million with Pacheco and sustained losses of over $750,000.

While these fraudulent schemes were ongoing, in September 2003, Pacheco and his wife filed a joint petition for Chapter 13 bankruptcy. During the pendency of that bankruptcy proceeding, Pacheco opened a bank account with the former Western Bank in the name of "IBGA" and an account with Wells Fargo in the name of "IBGA, LLC." The bankruptcy case was dismissed with no discharge in May 2004 on the recommendation of the Trustee.

A month later, in June 2004, Pacheco and his wife once again filed for Chapter 13 bankruptcy. This case, too, was dismissed with no discharge on the recommendation of the Trustee.

On October 4, 2005, the couple filed for bankruptcy a third time, this time under Chapter 7. The case was assigned to a different Trustee, and that Trustee granted the discharge of Pacheco's debts. In connection with the third bankruptcy proceeding, Pacheco represented (untruthfully) that he had no interest in any incorporated or unincorporated businesses. He failed to disclose his position or ownership interest in IBGANV, IBGA, or LDPR, and likewise failed to disclose the activities in which he had been engaging through those entities.

On October 5, 2005, the day after the third bankruptcy petition was filed, several checks were drawn from the Western Bank checking account Pacheco had opened in the name of IBGA. Pacheco had his daughters use some of those funds (all proceeds of Pacheco's fraudulent schemes) to buy, in IBGA's name, an office condominium which Pacheco had previously lost to foreclosure.

In December 2005, while the third bankruptcy proceeding was pending, Pacheco opened three more bank accounts: one in the name of "IBGAPR," one in the name of LDPR, and one in the name of "IBGA-GEFC." Various checks were drawn on these accounts

referencing what the government characterizes as "thinly-disguised personal uses."

The FBI ultimately uncovered Pacheco's fraud after an investigation. Pacheco was arrested and charged with securities fraud, mail fraud, conspiracy to conceal assets and make fraudulent transfers, concealment of assets, fraudulent transfer, uttering coins, and money laundering. A jury convicted Pacheco on all counts and the district court sentenced him to a top-of-the-guidelines sentence of 235 months imprisonment. The court's guidelines calculation included a two-level enhancement for abuse of a position of trust and a two-level enhancement for sophisticated means.

## II.

Pacheco first challenges the district court's denial of his Rule 29 motion for judgment of acquittal on Count 8 of the indictment, which charged him with making a fraudulent transfer in violation of 18 U.S.C. §§ 2, 152(7). We review the denial of a Rule 29 motion "de novo, examining the evidence in the light most favorable to the verdict, and asking whether a rational jury could find guilt beyond a reasonable doubt." Burgos-Montes, 2015 WL 2223304, at *13 (citations omitted).

The statute of conviction, § 152(7), makes it illegal for any person to

in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under [the Bankruptcy Code] by or against the person or any other person or corporation, or with intent to defeat the provisions of [the Bankruptcy Code], knowingly and fraudulently transfer[] or conceal[] any of his property or the property of such other person or corporation[.]

Count 8 of the indictment alleges that Pacheco

in his personal capacity and as an agent of IBGA[], with the intent to defeat the provisions of [the Bankruptcy Code], knowingly and fraudulently transferred and concealed property belonging to him, without authorization and unbeknownst to the bankruptcy trustee, creditors, and the United States Trustee, to wit: the defendant used IBGA[] monies, approximately [$50,000], to purchase an office building, Condominio Las Torres Navel, Yauco, Puerto Rico.

Pacheco argues that "IBGA's purchase of the office condominiums could not constitute a fraudulent transfer of Pacheco's own property" (emphasis added), and so he should have been granted a judgment of acquittal on Count 8.

Pacheco's conduct fits the statute like a glove. He commenced a bankruptcy proceeding, failed to disclose his interest in an entity which he owned, and then used that entity's funds (funds Pacheco had obtained by defrauding investors) to buy back a property which he had previously owned but had been foreclosed upon. In other words, Pacheco, "in a personal capacity or as an

agent [of IBGA] . . . with intent to defeat the provisions of [the Bankruptcy Code], knowingly and fraudulently transfer[ed] or conceal[ed]. . . his property or the property of [IBGA]." 18 U.S.C. § 152(7).

As we read Pacheco's brief, he does not dispute this analysis. Instead, his argument is that his conduct did not fit the language of the indictment, which charged him with transferring or concealing his own property, rather than IBGA's property. We reject this contention for two reasons.

First, a jury could have reasonably found that the money Pacheco used to buy the foreclosed condominium was Pacheco's property, even though it was nominally in a bank account under IBGA's name. The evidence presented at trial showed that the money Pacheco obtained by duping investors flowed freely among Pacheco, his relatives, and the various corporations that he set up. Indeed, it was precisely because Pacheco put the money in the IBGA account that he was able to shield it from his creditors in the bankruptcy proceeding (through his failure to disclose his interest in IBGA) and use it to buy back the condominium.[2] As we said in United States v. Ledée, 772 F.3d 21 (1st Cir. 2014), "[i]t

---

[2] For this reason, Pacheco's claim that "the purchase of the office condominium had no conceivable effect on Pacheco's bankruptcy estate" is flatly wrong.

- 10 -

is inconceivable that such a blatant scheme to manipulate an estate asset could be insulated from criminal consequences simply because the funds at issue" were nominally held in IBGA's name rather than Pacheco's.  Id. at 34.

Second, even if we were to assume that the money did not belong to Pacheco, it would mean only that there was a variance between the crime charged in the indictment and the evidence adduced at trial.  See United States v. Yelaun, 541 F.3d 415, 419 (1st Cir. 2008).  But a variance warrants reversal only if "it is prejudicial, e.g., by undermining the defendant's right 'to have sufficient knowledge of the charge against him . . . to prepare an effective defense and avoid surprise at trial, and to prevent a second prosecution for the same offense.'"  Id. (alteration in original) (quoting United States v. DeCicco, 439 F.3d 36, 47 n.4 (1st Cir. 2006)).  There was no prejudice here.  Pacheco knew exactly what he was charged with doing.  The indictment could hardly have spelled it out more clearly: it alleges that "the defendant used IBGA[] monies, approximately [$50,000], to purchase an office building, Condominio Las Torres Navel, Yauco, Puerto Rico."[3]

---

[3]    Pacheco obliquely suggests in a footnote in his reply brief that a constructive amendment of the indictment took place. This argument is waived for lack of adequate briefing.  See United

The district court did not err in denying Pacheco's Rule 29 motion.

### III.

We now turn to Pacheco's claims of sentencing error. The district court calculated Pacheco's total offense level as 36 and his criminal history category as I, yielding a guidelines range of 188 to 235 months in prison. The court sentenced Pacheco to a top-of-the-guidelines sentence of 235 months.

Pacheco argues that the district court erred in its guidelines calculation in two ways: in applying a two-level enhancement for abuse of a position of trust, U.S. Sentencing Guidelines § 3B1.3 (2012), and in applying a two-level enhancement for a fraud offense "involv[ing] sophisticated means," id. § 2B1.1(b)(10)(C). He also contends that the court failed to take account of key mitigating factors in sentencing him and imposed a sentence that was procedurally and substantively unreasonable.

In considering challenges to a sentence, we review legal conclusions de novo and factual findings for clear error. United States v. Zehrung, 714 F.3d 628, 631 (1st Cir. 2013). We review a district court's "application of the guidelines to a particular case on a 'sliding scale,' with the intensity increasing the 'more

_____

States v. Torres, 162 F.3d 6, 11 (1st Cir. 1998); United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990).

- 12 -

law-oriented' -- as opposed to 'fact-driven' -- the judge's conclusion is." Id.; see also United States v. Sicher, 576 F.3d 64, 70 (1st Cir. 2009). With respect to the procedural reasonableness inquiry, "we look to whether the district court properly calculated the Guidelines range, treated the Guidelines as advisory, considered the various 18 U.S.C. § 3553(a) factors, and adequately explained the chosen sentence." United States v. Morales-Machuca, 546 F.3d 13, 25 (1st Cir. 2008). And we review the substantive reasonableness of a sentence "under a highly deferential abuse of discretion standard." Id.

Applying these standards, we find no merit to any of Pacheco's arguments as to his sentence.

A.      Abuse of a Position of Trust Enhancement

"To apply the [abuse of a position of trust] enhancement, 'the district court must first decide that the defendant occupied a position of trust and then find that [he] used that position to facilitate or conceal the offense.'" Sicher, 576 F.3d at 71 (quoting United States v. Gill, 99 F.3d 484, 489 (1st Cir. 1996)). The guidelines commentary provides that a position of trust "is 'characterized by professional or managerial discretion.'" Id. at 72 (quoting U.S. Sentencing Guidelines § 3B1.3 cmt. n.1 (2012)). We may also consider whether the defendant used a personal

relationship with the victim in order to facilitate the fraud. See United States v. O'Connell, 252 F.3d 524, 529 (1st Cir. 2001).

Pachecho contends that the district court erred in applying the abuse of trust enhancement because he did not have a special relationship with his investors. Instead, Pacheco argues, he merely "relied on his powers of persuasion" and "distinguished bearing" in order to induce individuals to give him their money.

Pacheco has not persuaded us that the district court erred. As the government correctly notes, Pacheco did have preexisting relationships with at least some of his victims.[4] One victim was a family friend who "rel[ied] on [Pacheco's] word" that the Investment Contract (which was in English) was consistent with the Spanish-language document Pacheco gave her. Pacheco represented to the victim that he was giving her "an exclusive opportunity" because he knew her uncle. Pacheco in fact had

--------

[4] For this reason, the cases upon which Pacheco relies are inapposite. In neither United States v. Jolly, 102 F.3d 46 (2d Cir. 1996), nor United States v. Mullens, 65 F.3d 1560 (11th Cir. 1995), did the defendant have a preexisting personal relationship with his victims. See Jolly, 102 F.3d at 49 (noting that the record did not "disclose any relationship with particular investors in which [the defendant] occupied a position of influence beyond that enjoyed by garden-variety borrowers"); Mullens, 65 F.3d at 1566 (noting that there was no "evidence suggesting that Mullens had a special, close, or personal attachment, or fiduciary relationship, with any member of the country club that significantly contributed to his ability to perpetrate or conceal the ponzi scheme").

persuaded the uncle and his wife to invest with him as well.  These victims gave Pacheco the authority to "invest" large amounts of their money, based on their friendship with him and on Pacheco's assurances of the returns that would accrue.

Based on this evidence, the district court reasonably concluded that Pacheco occupied a position of trust as to at least some of his victims and abused that trust to further his scheme. See United States v. Willeumier, 98 F. App'x 558, 560 (7th Cir. 2004).

B.        Sophisticated Means Enhancement

The guidelines commentary describes the sophisticated means enhancement as follows:

> "[S]ophisticated means" means especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense.  For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S. Sentencing Guidelines § 2B1.1 cmt. n.8(B) (2012).  The list in the commentary of conduct that warrants the enhancement is not exhaustive.  The defendant need not have done any of the things listed in order to qualify for the enhancement, so long as the

- 15 -

offense as a whole shows "'a greater level of planning or concealment' than a typical fraud of its kind." United States v. Knox, 624 F.3d 865, 870-72 (7th Cir. 2010) (quoting United States v. Wayland, 549 F.3d 526, 528-29 (7th Cir. 2008)).

The district court's conclusion that this enhancement applied is unassailable. Pacheco set up multiple corporate entities in order to facilitate his fraudulent schemes and hide his ill-gotten gains from creditors during the bankruptcy proceeding. He convinced investors to participate in a scheme by having them sign a contract in English that differed from the Spanish-language document they had been given, and he made "lulling" payments to them at the outset so they would think that their investment would in fact make a return. We could go further, but we need not. These facts provide an ample basis for application of the enhancement. Cf. United States v. Foley, 783 F.3d 7, 25-26 (1st Cir. 2015) (upholding district court's application of the enhancement where the defendant used fake checks and fictitious payments in order to make his "'scheme more effective and difficult to thwart'" (quoting United States v. Evano, 553 F.3d 109, 113 (1st Cir. 2009)).

C.      Procedural and Substantive Reasonableness

Pacheco's basic argument as to the reasonableness of his sentence is that "the district court failed to consider crucial

mitigating factors," such as Pacheco's age, his "efforts to bring the coin scheme into compliance with federal law," and the fact he himself was purportedly "deceived by the charlatans who actually conceived the investment vehicles."

As to the latter two purported "mitigating factors," the district court simply rejected the premises. It found that Pacheco, far from being a victim, was a "leader and organizer" of the fraudulent scheme. And it found that Pacheco did not merely fail to comply with the law with respect to the "coin scheme"; he "defiantly continued" the scheme even after the U.S. Mint ordered him to stop. Those findings are supported by the evidence.

The district court also explicitly considered Pacheco's age. But it considered other relevant factors too -- Pacheco's history of fraudulent conduct, his targeting of vulnerable individuals, his repeated attempts to manipulate the proceedings, his total lack of remorse -- and decided that a sentence of 235 months was appropriate. That conclusion easily passes muster under our deferential standard of review.

Indeed, Pacheco's age could cut both ways in the sentencing calculus. It is true that, in general, "[t]he propensity to engage in criminal activity declines with age," and so persons convicted of a crime late in life may be unlikely to recidivate. United States v. Johnson, 685 F.3d 660, 661-62 (7th

Cir. 2012). Perhaps for this reason, the guidelines explicitly provide that advanced age may warrant a downward departure in sentencing. See id. But it is also true that "engaging in criminal activity at such an age provides evidence that [the defendant] may be one of the few oldsters who will continue to engage in criminal activity until [he] drop[s]." Id. at 662.[5] That may well be the case here; Pacheco has been swindling unwary victims for years and has shown no sign of changing his ways. At the sentencing hearing, he used his opportunity to allocute not to express any contrition, or apologize to the victims whose life savings he stole, but rather to assert that the court lacked jurisdiction over him. Cf. J.W. Barnard, Securities Fraud, Recidivism, and Deterrence, 113 Penn St. L. Rev. 189, 223 (2008) (listing the following factors as predictive of future misconduct in the securities fraud context: "(1) a pattern of wrongdoing as opposed to an isolated act; (2) lack of remorse or contrition; (3) possession of specific skills, coupled with conditions providing opportunity for harm (such as employment as an investment advisor or in a brokerage firm); and (4) recent conduct indicating an intent to recidivate"). The

---

[5] Indeed, while the recidivism rate declines with age, the decline is much less pronounced among those individuals with a significant criminal history. See U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines 28 (2004).

district court could have reasonably found that only a sentence of this magnitude would potentially deter Pacheco from returning to his illicit pursuits.

IV.

Affirmed.