# United States Court of Appeals
## For the First Circuit

No. 20-1959

UNITED STATES OF AMERICA,

Appellee,

v.

EDWARD BROWN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. George Z. Singal, U.S. District Judge]

Before

Thompson and Kayatta, Circuit Judges,
and Katzmann,* Judge.

Benjamin L. Falkner, with whom Krasnoo, Klehm & Falkner LLP
was on brief, for appellant.
Seth R. Aframe, Assistant United States Attorney, with whom
John L. Farley, Acting United States Attorney, was on brief, for
appellee.

February 16, 2022

---

* Of the United States Court of International Trade, sitting
by designation.

**THOMPSON, Circuit Judge.** Before us a second time, Edward Brown, who has been in prison for the last thirteen years for tax fraud and his role in a well-publicized armed standoff with the U.S. Marshals Service, appeals from his lengthy, but shorter-than-original, sentence of 300 months in prison. Lodging claims of both constitutional and sentencing error, he seeks to have his new sentence tossed in exchange for a sentence of time served. After careful review, we disagree, and so affirm.

BACKGROUND

## I.    The Crimes

The story of this case begins back in 2006.[1]  Then, Edward Brown and his wife, Elaine Brown, were indicted by a federal grand jury on charges related to their failure to pay taxes.[2]  They went to trial, although Edward attended only a few days before he decided to stop showing up. Their defense was that the government had no legal authority to collect the taxes. Eventually, a jury convicted both Edward and Elaine. But neither showed up for sentencing. They were each sentenced, in absentia, to 63 months

---

[1] In considering the defendant's challenge to his sentence, we take the facts from the trial record, the undisputed portions of the presentence investigation report, and the transcript of the sentencing hearing. See United States v. Rivera-Morales, 961 F.3d 1, 5 (1st Cir. 2020).

[2] Because these individuals both play a key role in this case and share the same surname, we will refer to them by their given names and mean no disrespect in doing so.

in prison.  Neither Edward nor Elaine surrendered to the federal authorities to serve their sentences.

It is that failure to surrender which leads us to the crimes of conviction at issue in Edward's appeal today.[3]  Warrants for the Browns' arrest issued.  Meanwhile, Edward was holed up at his New Hampshire residence along with Elaine.  Though the U.S. Marshals Service knew where the Browns were, getting them into custody proved less than straightforward (to say the least).  For about eight months, Edward made violent threats toward the government officials attempting to arrest them, such as (as one of the Marshals recalled at trial):  "If anything happens to my wife or I, then everybody associated with this case will get theirs."  As another Marshal recalled at trial, Edward said he thought the police were afraid to arrest him and that, if the authorities arrested him, "people are going to die.  The Marshal is going to die. . . .  It's going to be a war."  The Browns also made repeated public statements about their standoff, welcoming into their fortified home a number of supporters who agreed to help them out, including Daniel Riley, Jason Gerhard, Cirino Gonzalez, and Robert Wolffe.[4]

---

[3] If the reader thirsts for a more detailed account of the events, we've detailed them twice before.  See United States v. Brown, 669 F.3d 10, 14-17 (1st Cir. 2012); United States v. Gerhard, 615 F.3d 7, 12-18 (1st Cir. 2010).

[4] All four of these helpers were later arrested and charged. Three went to trial, were convicted, and received considerable

Realizing that a standard arrest wouldn't do for this high-risk circumstance, the Marshals began to develop plans to try to safely arrest the Browns. In the first attempt, officers tried to move clandestinely onto the property and arrest Edward on his routine of grabbing the mail at the end of his driveway. That attempt, though, failed when Riley, who was out walking a dog, encountered hidden officers. Riley was taken into custody, and when Edward heard the commotion, he was seen ascending a tower on top of his home and brandishing a .50-caliber rifle, pointing it toward the driveway.

After that failed attempt, the Marshals backed off for a few months while they hatched a new plan. In the meantime, they began to round up some of the Browns' soon-to-be convicted co-conspirators, who Marshals, for strategic reasons, had up to that point allowed to enter and exit the compound. And those arrests yielded a wealth of information about what the Marshals were facing inside the Brown enclave.

For example, Riley told the Marshals that he purchased twelve pounds of Tannerite, an explosive amalgam, at Edward's request. Gonzalez, Riley relayed, had brought firearms to the

sentences of imprisonment: 432 months for Riley, 240 months for Gerhard, and 96 months for Gonzalez. Gerhard, 615 F.3d at 12. Wolffe was handed a 30-month sentence after pleading guilty. Judgment, United States v. Wolffe, No. 07-cr-189-04 (D.N.H. Aug. 1, 2008), ECF No. 497.

compound and had performed armed patrols around the property with an assault rifle. Riley also told the Marshals that numerous handguns and rifles were stashed throughout strategic locations in the house. And he noted at least two black-powder explosive devices were in the home, plus he believed there were ten-to-twenty more of them in there. While detained, Riley also admitted to another inmate that he had assembled spring guns and placed explosive containers on trees around the home. Wolffe told the Marshals about the cache of firearms in the home, and that Edward and Riley had tested which firearms were best suited to make the biggest explosions when fired at the Tannerite devices.

Flash forward to October 2007, and it was time for the Marshals to test their newest game plan for seizing the Browns. The new strategy began with undercover Marshals contacting the Browns through a confidential informant. Along with the informant, three undercover Marshals retrieved some property from Elaine's dental office (which she had requested) and brought it to the Browns at their compound. After the delivery was complete, Edward brought beer onto the porch for the four retrievers and for a fourth undercover Marshal who had since arrived. After using the agreed-upon time-to-make-a-move codeword the Marshals had established, the undercover officers grabbed Edward, tasered him, and took him into custody. Other Marshals seized Elaine, and everyone walked away unscathed.

After the arrest, authorities searched the Browns' property. Numerous improvised explosive devices were scattered thereabout, which experts from the Bureau of Alcohol, Tobacco, Firearms and Explosives had to remove. Officials also found trip wires, shotgun shells from spring guns, and Tannerite bombs and plastic bags containing propane cans nailed to trees around the property. Inside the house, officials recovered eighteen firearms ranging from pistols to .50-caliber rifles. They also turned up approximately 60,000 rounds of live ammunition, including armor-piercing and incendiary rounds. In a single closet in the Browns' master bedroom, agents located twenty-two assembled and active pipe bombs. Elsewhere in the house, they found nine fully assembled spring guns, including evidence that they at one point had been mounted in the tree line. Agents also recovered cans of gun powder, some of which had nails taped to them. And, if all of that wasn't enough, even more explosive-making materials were recovered in various spots in the home.

## II. The Resulting Proceedings

Following their capture, a federal grand jury indicted Edward and Elaine, charging Edward on seven counts. Count I charged conspiracy to prevent officers of the United States from discharging their duties, in violation of 18 U.S.C. § 372. Count II -- conspiracy to commit an offense against the United States, in violation of 18 U.S.C. §§ 371 and 111(a) & (b). Count III

charged him with carrying and possessing a firearm in connection with a crime of violence, in violation of 18 U.S.C. § 924(c)(1). Count V -- being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Count VII -- obstruction of justice, in violation of 18 U.S.C § 1503. Count IX charged Edward with failing to appear for his tax-fraud trial, in violation of 18 U.S.C. § 3146. And Count X -- failing to appear for sentencing in the tax-fraud case, in violation of 18 U.S.C. § 3146.[5] Edward and Elaine went to trial, and they both were convicted on all counts.

Following on from his occasional outbursts at the trial, Edward was rather combative at his original sentencing and accompanying competency proceeding. Throughout the proceedings, he often lodged his own objections, even though he was represented by counsel. He butted in to argue about a competency witness's testimony while he was still on the stand, interrupted the government's counsel (one time, for example, to call him a liar), and interrupted the judge to argue with him and call him "beautiful." At one point when he was being removed from the courtroom, Edward accused the judge of being a "criminal" and a "communist." After being returned to the courtroom following a "timeout," Edward even told the judge that the district court

---

[5] Counts IV, VI, and VIII charged only Elaine, but the parties often describe the counts as they are numerated in the indictment, so we will follow the same trend.

readying to sentence him was "not a court." After Edward exercised his allocution rights, the judge proceeded to explain the sentence he imposed. But interjecting himself during that process, Edward demanded to be taken out of the courtroom again, as in his telling, he had "had enough of this trash." The court obliged his request.

Speaking of his allocution, Edward went on an extended rant about what he sees as a crisis of our country. Edward revealed to the court that he is a member of a group called the United States Constitution Rangers, whose goal is to "defend[] the Constitution and the people of the United States Republic." According to Edward, one core principle of the Rangers' philosophy is that its members "will ignore . . . any laws or orders that violate" certain constitutions and their Bill of Rights. And he openly questioned the authority of the federal laws, suggesting that the United States Constitution from 1789 was illegally replaced in 1879. Edward further informed the court that he intended to "expose a [criminal] cell in the government." Addressing his crimes, Edward told the court that he "could have killed all five of those agents [who came to arrest him] easily and lawfully."

In handing down the sentence, the district court explained its rationale. Noting that Edward had "engaged in a long period of lawlessness and endangered multiple government officials in the discharge of their duties," the court found Edward

(who, recall, was no longer in the courtroom at his own request) to be "entirely unrepentant" and concluded Edward "would have killed multiple marshals if they hadn't dealt with him so effectively." The court went on to note how Edward had recruited others into his beliefs, all of whom ended up with lengthy prison sentences. And the court explained that it was imposing a "severe punishment . . . to promote respect for the law and to deter others who attempted to engage in this type of conduct."

Ultimately, and considering the severity of Edward's conduct, the judge handed down a sentence as follows: 72 months total on Counts I, V, and VII; 60 months on Count II, to run concurrently with the sentence on Counts I, V, and VII; 12 months total on Counts IX and X;[6] and then the mandatory-minimum 360 months on Count III, the charge under § 924(c), to be served consecutively to the other sentences. As the court tallied that up, it meant a "total term of 444 months['] imprisonment." And that "term of imprisonment" was to run consecutively to the term

---

[6] The transcript of the sentence orally announced by the court reflects that the 12-month sentence on Counts IX and X ran concurrently to the sentences on Counts I, II, V, and VII. The written judgment, though, specified that the 12-month sentence ran consecutively -- not concurrently -- to those other counts. More on that later.

that Edward was already serving for the tax-fraud convictions, which had begun running on October 4, 2007.[7]

Flash forward to 2016, when Edward filed his second motion to vacate, set aside, or correct his sentence under 28 U.S.C. § 2255. We granted him leave (and his wife, too) in 2019 to file this second or successive § 2255 motion, see 28 U.S.C. § 2255(h), attacking his § 924(c) conviction based on Johnson v. United States, 576 U.S. 591 (2015). The district court granted Edward's motion with the government's assent, vacated the § 924(c) count based on United States v. Davis, 139 S. Ct. 2319 (2019), and ordered resentencing.[8]

Before resentencing, Dr. Jill Durand, a licensed psychologist retained by Edward, evaluated him and issued a report. In it, Dr. Durand described Edward as "self-confident, grandiose and strong in his convictions." Recounting her interviews with Edward, she noted that he "maintained and expressed his unchanging beliefs regarding the US Government, distrust of the Court system,

---

[7] The court also sentenced Edward to three years of supervised release.

[8] In Davis, the Supreme Court held that the residual clause of 18 U.S.C. § 924(c) (i.e., the clause defining a "crime of violence" as felonies "that by their nature, involve a substantial risk that physical force against the person or property of another may be used in the course of committing the offense," 139 S. Ct. at 2323–24 (cleaned up)) is unconstitutionally vague, id. at 2336. Johnson found a similarly worded provision of the Armed Career Criminal Act unconstitutionally vague. 576 U.S. at 606.

and his position that he did not have a proper hearing in Court." Edward also described the court as "unethical and immoral" and part of a criminal justice system that is a "racketeering organization with instructions from a European cartel," and stated that he views judges as unconstitutional. Regarding his crimes, he maintained that he "didn't do anything wrong" concerning his failure to pay his taxes. Edward, she noted, "believes that he has been the victim of an unjust system and that his actions were warranted, justified or not unlawful." Nonetheless, Dr. Durand opined that there is "little concern" that Edward would pose a danger to others if released. Still, she cautioned of the possibility that Edward would ignore or evade a probation officer's attempts to supervise him upon his release from prison.

Edward, represented by counsel, objected to being resentenced. He argued that it would violate the Double Jeopardy and Due Process Clauses of the Constitution to sentence him again, as, according to his math, he had already served the complete time he was sentenced on all but the § 924(c) sentence, which was vacated. We'll get into that more later, but the district judge rejected his argument. And putting that argument aside, Edward asked in the alternative that he be sentenced to time served. Conversely, the government sought a Guidelines-range sentence of between 360 months to life.

- 11 -

At the resentencing hearing, Edward, at the court's invitation, allocuted anew, with a couple of his recitals invoking a sense of déjà vu.  He said he was investigating a "criminal element within the government" and that the U.S. government remains beholden to a European cartel.  He also debuted a new claim -- the Department of Justice is a "terrorist organization."  When probed about the circumstances of his standoff with the Marshals, he told the court that he was "going to defend [him]self," including with his .50-caliber rifle if he had to.  When asked directly whether he thought he was violating the law with the months-long standoff, he responded "No."  Nor did he violate the law when he failed to pay his taxes, proclaiming those laws invalid.  And, falling back on an old refrain, he questioned the authority of the judge to pass sentence on him under the criminal laws.

Notwithstanding his views about the validity of the proceedings, Edward disavowed any intent to hurt anyone in the standoff and told the judge that he did not want or need his firearms anymore.  And though he denied the validity of the laws, he conceded that he had no choice but to follow them and committed to the court to doing so.

In the end, the district judge imposed a 300-month sentence -- that is, 144 months below the prior sentence and 60 months below the Guidelines range.  The court explained that sentence was warranted due to the nature and seriousness of the

- 12 -

crime, the characteristics of Edward, the need to deter Edward and others from committing the same crime, the need for just punishment and to promote respect for the law, and the need to protect the public from any further crimes committed by Edward. Specifically, the judge focused on the fact that Edward not only harbors his beliefs about the validity of the government and the laws, but he went further, acting on those avowals and putting others in danger. Edward, he observed, was the ringleader of the standoff, recruiting others and "brainwash[ing]" one, leading them to incur lengthy prison sentences. Finally, the judge emphasized that Edward did not appear to show remorse for his actions. Rather, he continues to believe that he never did anything wrong.

Standing at 78 years old at the time of resentencing, Edward objected to the substantive reasonableness of his sentence. His timely appeal followed.

## DISCUSSION

### I.  The Constitutional Challenges

Edward first raises two constitutional objections to his sentence. He claims that his new sentence violated the Double Jeopardy and Due Process Clauses of the Constitution because he had already served the entirety of all sentences imposed for all counts except for the final sentence on the § 924(c) count. And, because the § 924(c) conviction was vacated, he says that the district court could not have resentenced him on the counts as to

which he had already served his sentences.  We review these preserved issues of constitutional law de novo.  United States v. Szpyt, 785 F.3d 31, 36 (1st Cir. 2015).

### A.  Double Jeopardy

The Double Jeopardy Clause of the Fifth Amendment provides that "[n]o person shall . . . be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const., amend. V.  The guarantee against double jeopardy "has been said to consist of three separate constitutional protections."  United States v. DiFrancesco, 449 U.S. 117, 129 (1980) (quoting North Carolina v. Pearce, 395 U.S. 711, 717 (1969), overruled on other grounds by Alabama v. Smith, 490 U.S. 794 (1989)).  First, the clause "protects against a second prosecution for the same offense after acquittal."  Pearce, 395 U.S. at 717.  Second, it "protects against a second prosecution for the same offense after conviction."  Id.  And third, as particularly relevant here, "it protects against multiple punishments for the same offense."  Id.

The Supreme Court has limited the application of double-jeopardy principles in some respects, concluding, for example, that a successful appeal does not, in general, bar a defendant from being retried, Bullington v. Missouri, 451 U.S. 430, 438 (1981), or from receiving a harsher sentence, Pearce, 395 U.S. at 723.  Particularly with sentencing, the Court has made clear that criminal sentences do not carry the same constitutional finality

- 14 -

and conclusiveness as attaches with a jury's verdict of acquittal. DiFrancesco, 449 U.S. at 132-33. Thus, the touchstone for the double-jeopardy analysis is whether the defendant had a legitimate "expectation of finality in the original sentence." See id. at 139; see also Evans v. Michigan, 568 U.S. 313, 319-20 (2013) (explaining that double jeopardy does not preclude retrial after a properly granted mistrial because "no expectation of finality attaches to a properly granted mistrial"); United States v. Pimienta-Redondo, 874 F.2d 9, 16 (1st Cir. 1989) (en banc).

In conducting that analysis, we remain mindful that generally, as the Supreme Court has noted, "[a] criminal sentence is a package of sanctions that the district court utilizes to effectuate its sentencing intent." Pepper v. United States, 562 U.S. 476, 507 (2011) (quoting United States v. Stinson, 97 F.3d 466, 469 (11th Cir. 1996) (per curiam)). Indeed, the sentencing factors of 18 U.S.C. § 3553(a) "are used to set both the length of separate prison terms and an aggregate prison term comprising separate sentences for multiple counts of conviction." Dean v. United States, 137 S. Ct. 1170, 1175 (2017). Thus, the so-called sentencing-package doctrine comes into the fold in cases that "typically involve multicount indictments and a successful attack by a defendant on some but not all of the counts of conviction." Greenlaw v. United States, 554 U.S. 237, 253 (2008). And in those circumstances, "[b]ecause a district court's 'original sentencing

intent may be undermined by altering one portion of the calculus,'" Pepper, 562 U.S. at 507 (quoting United States v. White, 406 F.3d 827, 832 (7th Cir. 2005)), appeals courts "may vacate the entire sentence on all counts so that, on remand, the trial court can reconfigure the sentencing plan to assure that it remains adequate to satisfy the sentencing factors" of § 3553(a), Greenlaw, 554 U.S. at 253.

Applying that doctrine, we have held that "where the Guidelines contemplate an interdependent relationship between the sentence for the vacated conviction and the sentence for the remaining convictions -- a sentencing package -- a district court may, on a petition under 28 U.S.C. § 2255, resentence on the remaining convictions." United States v. Rodriguez, 112 F.3d 26, 30-31 (1st Cir. 1997) (footnote omitted). We, as have our judicial superiors, have recognized that "when a defendant is found guilty on a multicount indictment, there is a strong likelihood that the district court will craft a disposition in which the sentences on the various counts form part of an overall plan." Pimienta-Redondo, 874 F.2d at 14. And, "[w]hen the conviction on one or more of the component counts is vacated, common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture upon remand, within applicable constitutional and statutory limits, if that appears necessary in

order to ensure that the punishment still fits both crime and criminal." Id.; see United States v. García-Ortiz, 657 F.3d 25, 31 (1st Cir. 2011) ("When a defendant successfully challenges one of several interdependent sentences, the proper course often is to remand for resentencing on the other (non-vacated) counts.").

Further, we have previously concluded that a district court does not offend double jeopardy when it resentences, in forming a sentencing package anew, on counts surviving appeal or a § 2255 petition. See Pimienta-Redondo, 874 F.2d at 16. In Pimienta-Redondo, we faced two defendants' double-jeopardy challenge to their resentencing after one of their two counts of conviction was vacated. Id. There, the defendants were initially sentenced to consecutive terms of imprisonment on each of the two counts of conviction. Id. at 11. On appeal, we affirmed one count, vacated the other, and remanded. Id. at 11-12. On remand, the district court gave each defendant the same aggregate sentence -- just via a longer sentence on a single count. Id. at 12.

On appeal again from resentencing, the defendants contended that increasing their sentence on the surviving count of conviction violated their double-jeopardy protections. Id. at 16. Relying on the sentencing-package doctrine, we rejected their argument and concluded there is no double-jeopardy violation in the district court's resentencing a defendant to a longer sentence on counts unaffected by appeal. Id. Indeed, we recognized that

"[w]here the defendant challenges one of several interdependent sentences (or underlying convictions) he has, in effect, challenged the entire sentencing plan." Id. (quoting United States v. Shue, 825 F.2d 1111, 1115 (7th Cir. 1987)). Thus, we said, a defendant "can have no legitimate expectation of finality in any discrete portion of the sentencing package after a partially successful appeal," and thus no double-jeopardy claim. Id. (quoting Shue, 825 F.2d at 1115). Instead, the trial court may resentence a defendant on the remaining counts "to effectuate [its] original sentencing intentions." Id.

Edward says Pimienta-Redondo actually commands that his resentencing violated the Double Jeopardy Clause. He clings to our statement there that a "defendant 'has no legitimate expectation of finality in the original sentence[s] when he has placed those sentences in issue by direct appeal and has not completed serving a valid sentence.'" Id. (emphasis added) (alteration in original) (quoting United States v. Andersson, 813 F.2d 1450, 1461 (9th Cir. 1987)). According to Edward then, he, unlike the defendants in Pimienta-Redondo, has completed the valid sentences on all but the now-vacated § 924(c) conviction. Indeed, no matter how you calculate the original sentence (whether accepting that the sentence on Counts IX and X ran concurrently or consecutively to the sentences on Counts I, II, V, and VII), it is undisputed that Edward had served at least 84 months on the counts

- 18 -

of conviction in this case by the time he was sentenced.[9]  Thus, Edward says, he completed the entirety of the constituent sentences on Counts I, II, V, VII, IX, and X -- leaving only the 360-month consecutive sentence on the § 924(c) conviction remaining to serve.

The problem with that distinction, though, is that Pimienta-Redondo does not clarify what the "valid sentence" to be served is:  a string of constituent sentences or the aggregate sentencing package.  And on top of that, Pimienta-Redondo itself recognized explicitly that when a vacated count tears apart the overall sentencing plan, "common sense dictates that the judge should be free to review the efficacy of what remains in light of the original plan, and to reconstruct the sentencing architecture upon remand."  874 F.3d at 14.  Pimienta-Redondo thus does not control the outcome here.

And when we look to our sister circuits around the country, they are nearly uniform in their conclusion that a defendant has no legitimate expectation of finality for double-

_____

[9] Recall that the court's oral sentence stated that 12-month sentence on Counts IX and X ran concurrently to the sentences on Counts I, II, V, and VII.  The written judgment, though, specified that the 12-month sentence ran consecutively -- not concurrently -- to those other counts.  As stated, the discrepancy is irrelevant here because even if the sentence on Counts IX and X did run consecutively, the total on Counts I, II, V, VII, IX, and X would be 84 months.  And it is undisputed that Edward had served at least that amount before resentencing.

jeopardy purposes even where she served the entirety of a constituent sentence in a sentencing package. See United States v. Triestman, 178 F.3d 624, 631-32 (2d Cir. 1999) (Sotomayor, J.); United States v. Smith, 115 F.3d 241, 247 (4th Cir. 1997); United States v. Benbrook, 119 F.3d 338, 340-41 (5th Cir. 1997); Pasquarille v. United States, 130 F.3d 1220, 1222-23 (6th Cir. 1997); United States v. Smith, 103 F.3d 531, 535 (7th Cir. 1996); United States v. Alton, 120 F.3d 114, 116 (8th Cir. 1997); United States v. McClain, 133 F.3d 1191, 1192-94 (9th Cir. 1998); United States v. Easterling, 157 F.3d 1220, 1223-24 (10th Cir. 1998); United States v. Townsend, 178 F.3d 558, 569-70 (D.C. Cir. 1999).

In fact, the only circuit Edward points to that in theory has accepted his argument -- the Fourth Circuit -- quickly distinguished its prior holding and reached the opposite conclusion on the same issue less than a year later. Compare United States v. Silvers, 90 F.3d 95, 101 (4th Cir. 1996) ("As the government concedes, reimposition of sentence on counts upon which Silvers had fully satisfied his sentence violated the Double Jeopardy Clause."), with Smith, 115 F.3d at 247 (distinguishing Silvers where the defendant had not "fully discharged" his aggregate sentence). And subsequent panels of the Fourth Circuit have considered themselves bound by Smith -- not Silvers. See United States v. Douthit, 133 F.3d 918, at *1 n.* (4th Cir. 1998) (unpublished table decision) ("[B]ecause Smith recognized the

apparent conflict and distinguished Silvers, we are bound as a panel of the court by its holding." (citation omitted)); United States v. Butler, 122 F.3d 1063, at *1 n.* (4th Cir. 1997) (unpublished table decision) (same).

Our sister circuits have reasoned that if a sentence is properly viewed as a package -- that is, "one unified term of imprisonment," Townsend, 178 F.3d at 570 (quoting Easterling, 157 F.3d at 1224) -- then a defendant cannot have a legitimate expectation in finality where she "ha[s] not satisfied [her] sentence on the remaining counts in any meaningful sense," id.; see Pasquarille, 130 F.3d at 1223-24 ("Because the defendant has no legitimate expectation of finality in any discrete part of an interdependent sentence after a partially successful appeal or collateral attack, there is no double jeopardy bar to enhancing an unchallenged part of an interdependent sentence to fulfill the court's original intent." (quoting United States v. Harrison, 113 F.3d 135, 138 (8th Cir. 1997))). Thus, "the legal interdependence of sentences under the Guidelines permits a court to reconsider related sentences in the context of a collateral attack." Triestman, 178 F.3d at 631 (cleaned up) (quoting United States v. Mata, 133 F.3d 200, 202 (2d Cir. 1998)).

That is so because, in general, defendants do not "receive[] separate and distinct sentences" for related convictions -- they "receive[] one aggregate sentence for th[e]

- 21 -

interdependent offenses." Benbrook, 119 F.3d at 340. Thus, by attacking one portion of a sentencing package, a defendant "necessarily attack[s] the whole." Id. Defendants "cannot selectively craft the manner in which the court corrects th[e] judgment" to dismember the sentencing package favorably to them. Alton, 120 F.3d at 116 (quoting Gardiner v. United States, 114 F.3d 734, 736 (8th Cir. 1997)). Nor does resentencing in any real way disadvantage the defendant: Rather than enacting a double punishment for the non-§ 924(c) counts, a full resentencing to restructure the original sentencing package does "nothing more than put [the defendant] in the same position [she] would have occupied had [she] not been convicted under [§] 924(c) in the first place." Triestman, 178 F.3d at 631 (quoting Mata, 133 F.3d at 202).[10]

---

[10] Trying to dodge the onslaught of circuits rejecting his theory, Edward claims his view is commanded by Supreme Court precedent, citing to Ex parte Lange, 85 U.S. (18 Wall.) 163 (1873). There, the defendant was convicted on one count and erroneously sentenced to both one year in prison and a fine, though the statute only authorized either punishment, not both. Id. at 175. The defendant paid his fine and then began to serve the sentence for five days. Id. Realizing the error, the court tried to resentence the defendant to one year in prison, this time without a fine. The Supreme Court reversed, observing that the new sentence would have the prisoner pay the fine and be imprisoned for a year and five days. Id. The Court said that by the defendant's "fully suffer[ing] one of the alternative punishments . . . the power of the court to punish further was gone." Id. at 176.

Yet the Supreme Court has since cabined Lange's reach only to "the uncontested proposition that the Double Jeopardy Clause prohibits punishment in excess of that authorized by the legislature," and clarified that it does not stand "for the broader

So it follows, we echo our sister circuits in concluding that "[w]hen a defendant elects to challenge one part of a sentencing package whose constituent parts are truly interdependent," reconstituting "the entire sentencing package does not constitute a double jeopardy violation." Id. (internal quotation marks omitted) (quoting Mata, 133 F.3d at 202); see also United States v. Cain, 837 F. App'x 853, 856 (2d Cir. 2021) (continuing to apply this rule post-Davis).

Edward's double-jeopardy claim thus rises and falls with whether his original sentence is properly considered a package. We have acknowledged that a total aggregate sentence on multiple counts does not always mean there is a true sentencing package. See Rodriguez, 112 F.3d at 30 n.1. To determine whether a true sentencing package exists, we look to whether "the guidelines establish an interdependent relationship between the sentence vacated or subject to amendment and the sentence for the remaining convictions." United States v. Jordan, 162 F.3d 1, 6 (1st Cir.

_____

rule suggested by its dictum," referring specifically to the quoted language Edward harps on. Jones v. Thomas, 491 U.S. 376, 382-83 (1989). Moreover, even accepting Lange's dictum, it does not change the analysis here because the "punishment" to be "fully suffered" by Edward is not any single sentence (as it was in Lange), but the total sentencing package. See Townsend, 178 F.3d at 570 (recognizing that distinction). And that's particularly so where, as here, some of the defendant's original constituent sentences were reduced in light of the now-vacated portion of the package. The defendant can have no legitimate expectation of finality in those constituent sentences when she seeks to upset other portions of the package.

1998).  And we search for whether "the same basic course of conduct underlies both the vacated count and the count on which the conviction is affirmed."  Rodriguez, 112 F.3d at 30; see also United States v. Lassiter, 1 F.4th 25, 30 (D.C. Cir. 2021) (noting that "[o]ne indicator of the sentencing judge's intent [regarding a sentencing package] is the substantive relationship between the various counts").

Applying this framework, we are quite confident that Edward's original 444-month sentence was one package.  For one, all the counts of conviction arise out of the same events: Edward's failure to appear for his trial and sentencing in the tax-fraud case, his subsequent walling off in his booby-trapped New Hampshire property with a host of firearms and explosives, and his threats against the law-enforcement agents trying to wrangle him out of his fortress to serve his sentence on the tax-fraud counts.  See also Townsend, 178 F.3d at 567 ("Sentences which include § 924(c) counts are particularly well suited to be treated as a package.").

For another, it is quite clear that the mandatory-minimum sentence on the § 924(c) count substantially influenced the judge's initial sentence on the remaining counts.  Under the 2008 Sentencing Guidelines in effect at Edward's original sentencing, he faced an effective Guidelines range of 570 to 622 months.  See U.S.S.G. §§ 3D1.1(a), 3D1.1(b)(1), 3D1.3(a), 5G1.2(a)

- 24 -

(2008) (providing that the offense level is determined by taking the highest offense level of the counts in the group of charges, and then adding it consecutively to the mandatory-minimum sentence). Edward's sentence was substantially lower than the government's suggested Guidelines sentence of 570 to 622 months. And although Edward received statutory-maximum sentences on Counts I and II, see 18 U.S.C. § 372; id. § 371, he received sentences well below the maximums on the remaining counts, see id. § 924(a)(2) (maximum ten years' imprisonment for Count V); id. § 1503(b)(3) (same for Count VII); id. § 3146(b)(1)(A)(ii) (maximum five years' imprisonment for Counts IX and X). Had the district court thought the mandatory-minimum sentence on the § 924(c) count too harsh, it could have always departed even lower than it did and sentenced Edward to a single day on the remaining counts. See Dean, 137 S. Ct. at 1177; United States v. Sanders, 197 F.3d 568, 573 (1st Cir. 1999) (noting that a mandatory-minimum consecutive sentence does not break apart a sentencing package; rather, the mandatory minimum requires the sentencing court to "consider[] how far it want[s] to go above" that mandatory minimum). The court's decision in the first go-round to sentence Edward to a prison term at least 126 months less than the Guidelines range -- even when the judge emphasized that Edward was "entirely unrepentant," that his actions were "reprehensible," and that the judge "had no doubt in [his] mind that Mr. Brown would

have killed multiple marshals" -- further reveals that the initial sentence operates as one package. See Lassiter, 1 F.4th at 31 (noting that it is "especially" appropriate to presume a sentencing package "when the judge imposed a below-guidelines sentence for the violent felony").

On top of that, the Guidelines range Edward faced on the non-§ 924(c) counts was lower than it would have been had he not been charged under § 924(c). The § 924(c) conviction helped keep certain Specific Offense Characteristic enhancements off the non-§ 924(c) charges. See U.S.S.G. § 2k2.4 app. note 4 (2008). And that further bespeaks the interrelatedness of the sentences in the package. See Rodriguez, 112 F.3d at 28, 30-31 (noting that sentences were interrelated where the § 924(c) count prohibited adding certain enhancements to other counts).

To cinch things, Edward has made no attempt to rebut the interrelatedness of the various sentences making up his original 444-month total term of imprisonment. Rather, he put all his eggs in the basket of the contention that the completion of a constituent sentence gave him a legitimate expectation of finality in the original sentence on that particular count, and thus "the 'sentencing package doctrine' does not apply to him." Concluding, as we do, that a defendant has no legitimate expectation of finality until she has served the entire package of interrelated sentences, his argument thus founders. Edward's rights under the

Double Jeopardy Clause were not violated here, particularly where he received a new aggregate sentence substantially below the aggregate sentence initially imposed: 300 months compared to the original 444. See Triestman, 178 F.3d at 632 (noting the defendant "could not legitimately have expected a better result" where he received a "significantly reduced" aggregate sentence on resentencing).

B. **Due Process**

Given that conclusion, Edward's due-process claim fares no better. Edward contends that his due-process rights were violated because he "had a right to rely on the validity of the original sentences and to expect that when he had served his time behind bars, those sentences were complete." Notwithstanding the fact that his formulation of this claim is nearly identical to how he portrayed his double-jeopardy claim, Edward contends the due-process claim is entirely separate. But see United States v. Davis, 112 F.3d 118, 123-24 (3d Cir. 1997) (characterizing the due-process inquiry, too, as whether the defendant had a legitimate expectation of finality).

To make out his claim, Edward points to our discussion in Breest v. Helgemoe, 579 F.2d 95 (1st Cir. 1978). There, addressing a due-process challenge to a resentencing, we acknowledged the "real and psychologically critical importance" a prospective date of release may play for a defendant. Id. at 101.

Thus, we said that "[a]fter a substantial period of time . . . , it might be fundamentally unfair, and thus violative of due process for a court to alter even an illegal sentence in a way which frustrates a prisoner's expectations by postponing his parole eligibility or release date far beyond that originally set." Id.; see also Rodriguez, 112 F.3d at 31 & n.4 (acknowledging there could be due-process concerns with resentencing a defendant after, for example, long delay or actual release from custody). And we've since clarified:

> [T]here may be limits on the right to correct an erroneous sentence in cases "with extreme facts: a long delay, actual release of the defendant from custody based on the shorter sentence, singling out of the defendant for a belated increase apparently because of his commission of another offense for which parole revocation would have been available, and other troubling characteristics."

Rodriguez, 112 F.3d at 31 n.4 (quoting United States v. Goldman, 41 F.3d 785, 789 (1st Cir. 1994)).

Edward reminds us that he had served over seven years of his standoff-related convictions in prison at the time of resentencing (and about thirteen years in total including the tax-fraud convictions). Thus, his argument goes, he has served a "substantial period of time" -- including actually "complet[ing] sentences of incarceration" -- resulting in his having a right to rely on the original length of the sentences on the non-§ 924(c) counts.

- 28 -

The problem for Edward, though, is that his argument presumes that he can have a legitimate right to rely on the length of constituent sentences in a sentencing package -- which we just rejected in his double-jeopardy argument. And, to boot, he cannot identify any other court that has accepted his argument. Instead, the courts of appeals have rejected his argument in short order. See, e.g., Townsend, 178 F.3d at 570 (rejecting due-process claim "[b]ecause [the defendant] could not expect finality of his sentence on some counts even while he challenged others, [and thus] resentencing was not fundamentally unfair"); Easterling, 157 F.3d at 1223-24 (rejecting due-process argument for the same reason as the double-jeopardy claim). Indeed, the Fourth Circuit has described this argument as "merely a rehash" of the double-jeopardy argument and concluded that, since the defendant did not receive separate sentences but rather one package, he could have no right to rely on those sentences where he challenged one piece of the sentencing puzzle. Smith, 115 F.3d at 248.

We similarly reject Edward's contention that he had a right to rely on the length of his non-§ 924(c) sentences that built part of his sentencing package. Since Edward was sentenced to "a total term of 444 months['] imprisonment," he could have no reliance interest in the length of those constituent sentences. We think that particularly so where, as here, Edward had served just about a fifth of that total sentence by the time of

resentencing. See Rodriguez, 112 F.3d at 27-28, 31 (finding no fundamental unfairness where the defendant had served more than three years of an about 10-year sentence and he received a 45-month reduction at resentencing). And it was Edward -- not the government -- who petitioned to have his § 924(c) conviction vacated. What's more, in the end, Edward's new sentence was 144 months shorter than his original sentence.[11] Thus, Edward effectively received the same sentence as he would have had the § 924(c) count never been charged in the first place. See Pasquarille, 130 F.3d at 1223 (finding no due-process violation where "the defendant's total sentence ha[d] been reduced and he was resentenced according to the court's original sentencing plan," thus "put[ting] him back in the position he would have faced" without the § 924(c) conviction). That was not fundamentally unfair.

## II. Sentencing Reasonableness

Constitutional concerns quenched, we turn to review the sentence's reasonableness. To do so, we engage in our familiar bifurcated inquiry. United States v. Maldonado-Peña, 4 F.4th 1, 55 (1st Cir. 2021). We start by checking the procedural reasonableness of the sentence. Id. After we do so, we then turn

---

[11] We acknowledge that, even with this reduced sentence, Edward will be 91 years old by the time he is slated for release.

to evaluate a defendant's arguments that his sentence is also substantively unreasonable.  Id.

### A.    Procedural Reasonableness

So we begin with Edward's procedural-reasonableness challenge.  "A sentence is procedurally unreasonable when the district court commits a procedural error such as 'failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence -- including an explanation for any deviation from the Guidelines range.'"  United States v. Pupo, 995 F.3d 23, 28 (1st Cir. 2021) (quoting United States v. Díaz-Rivera, 957 F.3d 20, 25 (1st Cir. 2020)).

In assessing preserved claims of procedural reasonableness, we apply a "multifaceted abuse-of-discretion standard whereby we afford de novo review to the sentencing court's interpretation and application of the sentencing guidelines, examine the court's factfinding for clear error, and evaluate its judgment calls for abuse of discretion."  Maldonado-Peña, 4 F.4th at 55-56 (cleaned up) (quoting United States v. Arsenault, 833 F.3d 24, 28 (1st Cir. 2016)).  For judgment calls, we chalk the district court's decision up to an abuse of discretion only when we're "left with a definite conviction that 'no reasonable person

could agree with the judge's decision.'" Id. (quoting United States v. McCullock, 991 F.3d 313, 317 (1st Cir. 2021)). If a defendant fails to preserve his procedural-reasonableness claim, though, we then apply the "quite formidable" plain-error standard. McCullock, 991 F.3d at 317.

Edward lodges a single attack on the procedural reasonableness of his sentence. He contends the district court violated his First Amendment rights to maintain and express his beliefs when it relied on those beliefs to increase Edward's sentence. Specifically, Edward takes issue with the district court's emphasis of the fact that, even after his time already served in prison, he continues to believe that the criminal laws are not valid and denies any wrongdoing.

Edward's counsel argued to the district court that it was inappropriate for the court to rely on Edward's beliefs in fashioning a sentence. Edward's counsel did not, however, lodge any formal objection to the procedural reasonableness of the sentence on that ground.[12] Nonetheless, even assuming favorably to Edward that he preserved his claim of procedural reasonableness,

_____

[12] We have also seemed to imply that this particular ground of sentencing error is related to substantive -- not procedural -- reasonableness. See United States v. Alvarez-Núñez, 828 F.3d 52, 55 (1st Cir. 2016); but see United States v. Williamson, 903 F.3d 124, 136 (D.C. Cir. 2018) (lumping this ground in as a procedural error). We assume without deciding that a sentencing judge's improper reliance on a defendant's protected First Amendment activity can make out a claim of procedural unreasonableness.

his claim fails under even the more-defendant-friendly abuse-of-discretion framework.

In determining how best to fashion a criminal sentence, "the sentencing authority has always been free to consider a wide range of relevant material." United States v. Alvarez-Núñez, 828 F.3d 52, 55 (1st Cir. 2016) (quoting Payne v. Tennessee, 501 U.S. 808, 820-21 (1991)). This gives the sentencing judge room to conduct "an inquiry broad in scope, largely unlimited either as to the kind of information [it] may consider, or the source from which it may come." Id. (quoting United States v. Tucker, 404 U.S. 443, 446 (1972)).

There are limits to that general rule, though. As relevant here, one of those limits is that "a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge." Wisconsin v. Mitchell, 508 U.S. 476, 485 (1993). However, as with most legal propositions, context is key. "[T]he Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." Dawson v. Delaware, 503 U.S. 159, 165 (1992). Accordingly, though the Supremes have found First Amendment error in a sentencing court's review of merely "abstract beliefs," see Dawson, 503 U.S. at 167, the Court has also readily permitted consideration of a defendant's

- 33 -

beliefs when they are "relevant to the issues involved," id. at 164; see Alvarez-Núñez, 828 F.3d at 55 ("The upshot is that conduct protected by the First Amendment may be considered in imposing sentence only to the extent that it is relevant to the issues in a sentencing proceeding."). For example, the Court has found no error where a sentencing judge considered "the elements of racial hatred" in the defendant's crime as well as the defendant's "desire to start a race war" when relevant to the sentencing metrics. Barclay v. Florida, 463 U.S. 939, 949 (1983) (plurality opinion); see id. at 970 & n.18 (Stevens, J., concurring in the judgment). But it has assigned error to the consideration of a defendant's membership in the Aryan Brotherhood when it had no relevance to the crimes at issue. Dawson, 503 U.S. at 166-67.

As we've explained, a defendant's beliefs may become relevant at sentencing "in a multiplicity of ways." Alvarez-Núñez, 828 F.3d at 55-56. Beliefs and associations "may legitimately be used to rebut mitigating evidence proffered by the defendant." Id. at 56. Protected conduct may also become relevant to evaluate a defendant's remorse, likelihood of reoffending, or the extent of punishment needed for deterrence. Id. (collecting cases); see United States v. Williamson, 903 F.3d 124, 136 (D.C. Cir. 2018) (finding no First Amendment violation in considering protected activity that bore on "the seriousness of [the] offense and on the need to protect the public generally . . . from harm").

Given that framework, Edward's claim readily fails. Though Edward thinks the district court could not fashion a sentence relying on his beliefs about the authority of the government or the criminal laws, those beliefs are highly relevant to the § 3553(a) factors. See Alvarez-Nunez, 828 F.3d at 55-56. Regarding his crimes, Edward maintained that he "didn't do anything wrong" concerning his failure to pay taxes, and he said that "the law is wrong." When asked directly whether he thought he was violating the law with the months-long standoff, he said no. He told the judge that the laws are not valid. He also questioned the authority of the judge to pass sentence on him under the criminal laws. And Dr. Durand noted in her evaluation that Edward "believes that he has been the victim of an unjust system and that his actions were warranted, justified or not unlawful."

As the district court amply explained, Edward's statements go "beyond simply his beliefs." Rather, the judge saw Edward's statements as "a recipe for trouble," suggesting that Edward may be dangerous when released from prison. Those beliefs also, in the judge's view, reflected that Edward did not intend to obey the law. And, as the district judge put it, the problem is not that Edward holds these abstract beliefs: "The problem is that he acts on his beliefs, and, by acting on his beliefs, he put in danger multiple individuals." And those concerns played into the court's consideration of the relevant sentencing factors,

which it said included (among others) the need to promote respect for the law, the need to deter Edward and others from committing the same crimes, and the need to protect the public from further crimes committed by Edward. See 18 U.S.C. § 3553(a)(2).

We find no procedural error in the district court's reliance on Edward's beliefs in considering these sentencing factors. See, e.g., United States v. Schmidt, 930 F.3d 858, 868 (7th Cir. 2019) ("[T]he court properly considered Mr. Schmidt's white supremacist ideas and hatred for the United States as evidence that he presents a threat of future dangerousness to the community." (cleaned up)); United States v. DeChristopher, 695 F.3d 1082, 1098 (10th Cir. 2012) ("Defendant's statements that he would 'continue to fight' and his view that it was 'fine to break the law' were highly relevant to the[] sentencing factors."); United States v. Smith, 424 F.3d 992, 1016-17 (9th Cir. 2005) (no error in considering the defendant's allocution statements, including about the district court's "lack of jurisdiction," because they were relevant to the defendant's remorse and threat to the public on release); United States v. Simkanin, 420 F.3d 397, 417-18 (5th Cir. 2005) (finding no constitutional error where the district court relied on the defendant's "specific beliefs that the tax laws are invalid and do not require him to withhold taxes or file returns . . . [because they] are directly related to

the crimes in question and demonstrate a likelihood of recidivism").

Edward further contends that the district court erred in relying on these personal, strongly held beliefs because he, at other points, appeared to show that there should be no concern that he would follow the law upon release. For example, Edward told the court that he "will follow" the criminal laws even though "they're not valid" because he has "no choice." And he emphasized his good behavior in prison as showing that he has submitted to the government's authority notwithstanding his beliefs.

We will not second-guess the sentencing judge's determination of the sincerity of Edward's statements absent a finding of clear error. See United States v. Ubiles-Rosario, 867 F.3d 277, 292 n.15 (1st Cir. 2017); United States v. Cortés-Medina, 819 F.3d 566, 573 (1st Cir. 2016) ("[T]he district court is in the best position to weigh the credibility of a claim of rehabilitation and to balance the sentencing scales in light of such a claim."). Edward has made no effort to demonstrate that standard here, and we at any rate find no error in the district court's assessment.

The district court considered Edward's statements and rejected them. Though the judge acknowledged Edward's seemingly good behavior in prison, he suggested that it was not very applicable to determining Edward's potential behavior after release to society because prison is "designed to eliminate

resistance." And the judge also acknowledged Edward's statements that he "will follow" the law, but emphasized that it was "hard to accept" that Edward wouldn't break the law again or would follow conditions of release since Edward "indicate[d] to this minute that . . . they're not valid laws" and that he does not accept the authority of the court. From our vantage, that appraisal was not clearly erroneous.

B.   **Substantive Reasonableness**

Satisfying the procedural-reasonableness probe, we turn now to test the sentence's substantive reasonableness.

"A sentence is substantively reasonable if the 'sentencing court has provided a plausible sentencing rationale and reached a defensible result.'" Pupo, 995 F.3d at 29 (quoting United States v. Flores-Quiñones, 985 F.3d 128, 133 (1st Cir. 2021)). This review is highly deferential. United States v. Fuentes-Moreno, 954 F.3d 383, 396 (1st Cir. 2020). We evaluate the reasonability of the overall sentence "in light of the totality of the circumstances." United States v. Flores-Machicote, 706 F.3d 16, 20 (1st Cir. 2013). And we recognize that we owe deference to the sentencing court's informed discretion in fashioning an appropriate sentence, ever cognizant of the fact that "[t]here is more than one reasonable sentence in virtually any case." Fuentes-Moreno, 954 F.3d at 396 (quoting United States v. Matos-de-Jesús, 856 F.3d 174, 179 (1st Cir. 2017)). Thus, we will find a sentence

substantively unreasonable "only if it falls beyond the expansive universe of reasonable sentencing outcomes."  United States v. Benoit, 975 F.3d 20, 24 (1st Cir. 2020) (quoting United States v. Rodríguez-Torres, 939 F.3d 16, 43 (1st Cir. 2019)).  In other words, "we do not reverse simply because we would have sentenced the defendant differently."  Id.

Edward submits four reasons his sentence was unreasonable:  (1) the district court's reliance on Edward's beliefs; (2) the total sentence as compared to the sentences given his co-defendants; (3) the total sentence considering his advanced age; and (4) the total sentence, taking everything into account, was longer than necessary to achieve the sentencing goals of § 3553(a).  We take each in turn, though mindful that a sentence's substantive reasonableness must be eyeballed in light of the totality of the circumstances.  See Flores-Machicote, 706 F.3d at 20.

### 1.  Belief system

First, Edward contends, tacking on to his procedural-reasonableness argument, that the district court's reliance on his beliefs resulted in a substantively unreasonable sentence.  But, for the same reasons this failed as a procedural-reasonableness argument, it fails as a substantive-reasonableness argument, too.  Onward.

## 2. Co-defendant disparity

Next, Edward contends that there was an unwarranted disparity between the sentence he received and the sentences his co-conspirators received on resentencing. In imposing sentence, a district court must consider "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). Though that is typically concerned with national disparities, we have also considered claims that a sentence is substantively unreasonable because of a disparity relative to a co-defendant's sentence. See United States v. Grullon, 996 F.3d 21, 35 (1st Cir. 2021).

Not all co-defendant disparities in sentencing yield a substantively unreasonable sentence. As we've explained, "[t]he key word is 'unwarranted' -- that is, § 3553(a)(6) does not ban all disparities, just 'unwarranted' ones." United States v. Romero, 906 F.3d 196, 211 (1st Cir. 2018). A defendant "is not entitled to a lighter sentence merely because his co-defendants received lighter sentences." United States v. Dávila-González, 595 F.3d 42, 50 (1st Cir. 2010) (quoting United States v. Wallace, 573 F.3d 82, 97 (1st Cir. 2009)). To make out a well-founded claim of sentencing disparity, a defendant must compare apples to apples. United States v. Mateo-Espejo, 426 F.3d 508, 514 (1st Cir. 2005). Among other things that may throw off a direct comparison, we have

looked at a co-defendant's cooperation, the nature of her cooperation, and her choice to plead guilty instead of going to trial, see United States v. Reyes-Santiago, 804 F.3d 453, 467 (1st Cir. 2015) (collecting cases), as well as her relative culpability or role in the crime, see United States v. Reverol-Rivera, 778 F.3d 363, 366 (1st Cir. 2015). In the end, cases of identically situated defendants "are unusual to say the least." Grullon, 996 F.3d at 35-36.

Applying those principles here, Edward's challenge fails. Edward clamors that his co-defendants each received sentences of time served on resentencing even though their original sentences were substantially higher than what they had to that point served.[13] Yet Edward fails to grapple with the reasons the sentencing judge gave for the disparity.

First, the judge explained that Elaine, Riley, and Gerhard each showed that they had "learned" during their prison terms that what they had done was wrong. As the judge put it, "[t]hey appeared broken by the period of incarceration," leaving

---

[13] At the time of resentencing, Elaine had served 85 months of her 420-month sentence. Mot. on Resentencing at 1 & n.2, United States v. Brown, No. 09-cr-30 (D.N.H. Jan. 16, 2020), ECF No. 311. Riley had served, as best we can tell, around 12 years of his 36-year sentence. And Gerhard, too, had served over 12 years of his original 20-year prison sentence. Def.'s Obj. to Resentencing & Sentencing Mem. at 3, United States v. Gerhard, No. 07-cr-189 (D.N.H. Jan. 20, 2020), ECF No. 713.

the judge with no doubt that there was "no risk" that any of them would engage in the same behavior. Edward, though, didn't give the judge the same confidence given his comments that he still thinks he did nothing wrong, and about the authority of the law and the courts.

Second, Edward acknowledges that he "may have been more culpable" than his co-defendants but suggests he wasn't more-culpable enough to justify serving almost double time in prison. Yet the district court disagreed. It noted that Edward was "the leader and instigator of the entire standoff." It also emphasized that Edward dragged others into his crime to support his standoff, "brainwash[ing]" one of the co-defendants. Both rationales were supported by the record.

Ultimately, the sentencing judge assessed Edward's greater culpability, combined with all the other factors relevant to his sentencing (including his continued belief he did nothing wrong), and concluded that he merited a substantially higher sentence than his co-defendants. He gave a plausible rationale and reached a defensible result relative to Edward's co-defendants, so we find no abuse of discretion. See Grullon, 996 F.3d at 36; Reverol-Rivera, 778 F.3d at 367.

3. Age

Finally, Edward appears to contend that the district court failed to consider his advanced age and the fact that, under

the average life-expectancy, he has received "[i]n effect" a life sentence.  This argument, too, fails.

True, a sentencing court is required to consider a defendant's age as a potential mitigating factor.  See 18 U.S.C. § 3553(a)(1) (identifying as a sentencing factor "the history and characteristics of the defendant").  Also true, "in general, '[t]he propensity to engage in criminal activity declines with age,' and so persons convicted of a crime late in life may be unlikely to recidivate."  United States v. Pacheco-Martinez, 791 F.3d 171, 180 (1st Cir. 2015) (alteration in original) (quoting United States v. Johnson, 685 F.3d 660, 661-62 (7th Cir. 2012)).

But even accepting that, a defendant's age is but one of many factors a sentencing court must consider.  See United States v. Rivera-Morales, 961 F.3d 1, 21 (1st Cir. 2020); see also 18 U.S.C. § 3553(a).  The judge here surveyed all the relevant factors (including the seriousness of the crime, Edward's continued lack of remorse, and his continued rejection of the authority of the laws and the court) and concluded they outweighed this mitigating factor.  Indeed, even considering Edward's advanced age, this could well be a case where Edward's crimes (committed when he was already 64 years old), as well as his continued rejection of the authority of the criminal laws, revealed that he "may be one of the few oldsters who will continue to engage in criminal activity until he

drops." Pacheco-Martinez, 791 F.3d at 180 (cleaned up) (quoting Johnson, 685 F.3d at 662).

As we have explained time and again, a sentence is not rendered unreasonable simply because the sentencing court didn't apply as much emphasis to some mitigating factors as the defendant hoped. See, e.g., Pupo, 995 F.3d at 32; United States v. Dávila-Bonilla, 968 F.3d 1, 12 (1st Cir. 2020). And as we've explained specifically in the context of a nearly identical argument, a weighty sentence given to a defendant of advanced age is not substantively unreasonable where the sentencing judge, considering all the relevant factors, offers a plausible rationale and delivers a defensible result. See Pacheco-Martinez, 791 F.3d at 180 (finding no substantive unreasonableness in spite of the defendant's age because, in part, he "ha[d] shown no sign of changing his ways" and, at sentencing, expressed no remorse but instead "assert[ed] that the court lacked jurisdiction over him"); United States v. Angulo-Hernández, 565 F.3d 2, 13 (1st Cir. 2009) (no substantive unreasonableness where the defendant's advanced age "was outweighed by the severity of [his] current offense and history of drug crimes"). The judge did so here.

4.  Zooming out

All told, the district court, in light of all the circumstances here, provided a plausible rationale and delivered a defensible result. In fact, the result it delivered was a

sentence substantially below the Guidelines range.  See United States v. Cameron, 835 F.3d 46, 52 (1st Cir. 2016) ("It is a rare below-the-range sentence that will prove vulnerable to a defendant's claim of substantive unreasonableness." (quoting United States v. King, 741 F.3d 305, 310 (1st Cir. 2014)). Considering all of Edward's arguments as a whole, we spy no error.

## CONCLUSION

Our work complete, the judgment below is **affirmed.**